STATE OF NORTH CAROLINA, Plaintiff v. AUDREY GOBAL, Defendant

No. COA06-773

(Filed 16 October 2007)

**1. Evidence— lay opinion testimony—statutory limit—matter of fact—opinion as to witness credibility—not plain error**

A detective's testimony in a prosecution for first-degree sexual offense and related crimes against a child that a State's witness must have been less nervous during an interview with the detective because he was breathing less hard was an instantaneous conclusion as to mental state and matter of fact that was not subject to the limits of lay opinion testimony provided by N.C.G.S. § 8C-1, Rule 701. The detective's further testimony that because the witness became less nervous during the interview, he must have been telling the truth, was not a statement of fact, was subject to the Rule 701 limits of lay opinion testimony, and was inadmissible since it was an opinion on the credibility of the witness that was not helpful to the jury's determination of a fact in issue. However, the admission of this opinion testimony was not plain error where the case ultimately rested on whether the jury believed that story of the State's witness or that of defendant, and given the amount of testimony which directly or indirectly impeached defendant, the jury had ample evidence besides the detective's testimony which might have caused it to disbelieve the story of defendant and believe the story of the State's witness.

**2. Evidence— cross-examination—invited error**

The trial court did not err in a double first-degree sex offense, felony child abuse, and indecent liberties with a child case by allowing the testimony of a social worker during cross-examination by defendant because statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law.

**3. Appeal and Error— preservation of issues—failure to raise constitutional issue at trial**

The trial court did not err by sentencing defendant to consecutive terms of imprisonment for two counts of first-degree sexual offense even though defendant contends it violates the constitutional guarantee against double jeopardy, because: (1)

STATE v. GOBAL

[186 N.C. App. 308 (2007)]

defendant's vague passing mention of this issue after the jury had been instructed, returned its verdict, and had been dismissed from the courtroom was not sufficient to show it raised this constitutional issue to the trial court; and (2) defendant thus failed to preserve this issue for appellate review.

Judge HUNTER concurring in part and dissenting in part.

Appeal by defendant from judgments entered 13 April 2005 by Judge John R. Jolly, Jr. in Wake County Superior Court. Heard in the Court of Appeals 19 February 2007.

*Attorney General Roy A. Cooper, III, by Assistant Attorney General David Gordon, for the State.*

*Brian Michael Aus for defendant-appellant.*

STROUD, Judge.

On 27 July 2004, defendant was indicted by the Wake County Grand Jury on two counts of first-degree sexual offense, one count of felony child abuse, and one count of indecent liberties with a child. Defendant was tried before a jury in Wake County Superior court from 11 to 13 April 2005. The jury found defendant guilty of all charges. Thereafter, the trial court sentenced defendant to 230 to 285 months for first-degree sexual offense, felony child abuse, and indecent liberties with a child, and to a consecutive sentence of 230 to 285 months for first-degree sexual offense. Defendant appeals.

For the reasons which follow, we hold that the trial court did not commit plain error when it admitted the testimony of a police detective which tended to vouch for the veracity of the State's main witness. We further hold that defendant invited any error assigned to the testimony of a social worker which tended to impeach defendant. Finally, we hold that defendant failed to preserve the constitutional question of double jeopardy for appellate review. Accordingly, defendant received a fair trial and her convictions are affirmed.

I. Background

Defendant's convictions arose from events which occurred on 2 April 2004 and involved defendant's seven year-old daughter ("Victim"). John Paul McCloskey ("McCloskey"), with whom defendant began a sexual relationship in January of 2004, participated in those events. At the time of defendant's trial, McCloskey was charged

with two counts of first-degree statutory sexual offense and with taking indecent liberties with a child as a result of his participation.

McCloskey and the victim were the only eyewitnesses other than defendant. The victim was not called to testify at trial. McCloskey was the State's main witness, and defendant testified in her own behalf. The State also offered into evidence tape recordings of two phone conversations McCloskey had with defendant, and three witnesses whose testimony either corroborated McCloskey's testimony or tended to impeach defendant.

McCloskey testified as follows: At some time prior to 2 April 2004, defendant mentioned to him that she had fantasies of herself, McCloskey, and the victim all having sex together. On Friday, 2 April 2004, defendant and the victim arrived at about 1:30 p.m. at McCloskey's apartment in Apex to spend the weekend. The three of them went out to the mall for a while and returned to his apartment to have dinner. While defendant was cleaning up the dishes, McCloskey washed the victim's hair, as requested by defendant. By about 6:00 p.m., the three of them sat down to watch TV. Defendant then grabbed the victim and McCloskey by their hands and brought both of them into the bedroom. In the bedroom, defendant lay down on her back, with no clothes on. McCloskey was wearing shorts, and the victim was wearing a T-shirt and underwear. McCloskey described the victim's demeanor at this point as "easygoing." McCloskey then began to perform cunnilingus on defendant. According to McCloskey, the victim interjected, "I can take care of Mom from here," so McCloskey began kissing defendant while the victim masturbated her. After kissing McCloskey, defendant performed fellatio on him for about ten minutes. During the time that defendant was performing fellatio on McCloskey, the victim continued to masturbate defendant. Defendant then asked the victim if she would like McCloskey to do the same thing to her that he had done to defendant, referring to cunnilingus. McCloskey then performed cunnilingus on the victim for about three to five minutes. Defendant then told the victim to "[g]o down and lick [McCloskey's] penis" and the victim then performed fellatio on McCloskey, while McCloskey kissed defendant. McCloskey and defendant completed the sexual encounter by having intercourse while the victim was lying on the bed next to them. They then got dressed and went to the living room to watch a movie or TV. Defendant and the victim stayed with McCloskey for the rest of the weekend but nothing else "weird" happened. Defendant and the victim returned to their home in Pender County on Sunday.

According to McCloskey, defendant was worried about losing her children if anyone found out about the events of 2 April 2004. He and defendant discussed the sexual encounter several times after it had occurred, and defendant tried to figure out ways that they could maintain consistency in their stories, so that "neither one of [them] got in trouble." They considered saying that "[McCloskey] just licked [the victim] or gave [the victim] oral sex and that [defendant] was not in the room." or that defendant "caught [McCloskey and the victim] on the couch."

McCloskey further testified that on 14 June 2004, he met with Detective Tim Kerley at the Apex Police Department for an interview. At the beginning of the interview, McCloskey denied that anything happened with the victim, but after Detective Kerley suggested that he take a polygraph test, McCloskey decided that he would admit what really happened. McCloskey testified that he decided to tell the truth because he was feeling awful and guilty about what had happened. McCloskey gave Detective Kerley a handwritten statement regarding the events of 2 April 2004, which was admitted into evidence.

According to McCloskey, after he gave the handwritten statement to Detective Kerley, McCloskey left the police department and contacted his attorney. McCloskey's attorney provided him with a tape recorder to record some conversations with defendant. McCloskey decided to record these conversations with defendant because defendant had asked him to change his statement to say that "she wasn't involved or implicated in any way." The State offered into evidence, without objection, recordings that McCloskey made of two telephone conversations with defendant, each about 20 minutes long, on 19 June 2004 and 20 June 2004. In the 19 June 2004 conversation, defendant asked McCloskey to "talk to my lawyer and tell her a different story." She asked McCloskey if he was going to try to help her out and stressed to him that she did not want to lose her children and that the unborn baby was his.[1] McCloskey stated in the conversation that because of the charges, he did not think that either of them would be able to be around children and that his father would like to adopt the baby. Defendant responded "that don't [sic] have to be, John. If you'll help me, if you'll change your story and at least be for me and not totally against me . . . do it for the baby's sake." After further conversation about the possibility of a perjury charge, defendant told McCloskey, "[t]he only way to save my kids is you. You're the

---

1. Defendant had been pregnant for about a month when she began her sexual relationship with McCloskey in January 2004.

only one that can help me save my kids . . . . And at least, John, as long as I have them, I can send you pictures or send your mama pictures of the baby, and you could have some contact, I mean, a little bit."

In the second phone conversation, recorded 20 June 2004, defendant and McCloskey again discussed defendant's concern that she would lose her children. Defendant again asked McCloskey if he would try to help her. He asked her what he needed to do. Defendant told him that the "only thing that's going to help me, and it might not keep me out 100 percent, but help me is to say I wasn't there . . . . [W]e know you're going to get in trouble no matter what the outcome is, but at least you can help me cover my tracks a little bit."

Later in the trial, the State called Detective Kerley, who corroborated most of McCloskey's testimony regarding his interview and written statement Detective Kerley also testified that McCloskey had asked him on the day of the interview if defendant would lose her child or children. McCloskey phoned Detective Kerley after the interview and asked if he could add on to his written statement so that "[defendant] wouldn't get into any trouble." However, McCloskey never repudiated the written statement or the statements he made in the interview with Detective Kerley, even after telling Detective Kerley that he had spoken to some attorneys and they had "told him that he shouldn't have written out the confession."

The State also called Keisha Hooks of the Pender County Department of Social Services (DSS) as a witness. Hooks testified that on 13 May 2004 she investigated a report, received by DSS the day before, that the victim had been sexually abused and that defendant had participated in the incident. During an interview with defendant pursuant to the investigation, Hooks informed defendant that there was an allegation that defendant had watched while McCloskey sexually assaulted the victim at his home in Apex. Defendant denied the allegations but admitted that she and the victim had visited McCloskey in Apex. Defendant told Hooks that after the victim was asleep in the bedroom, McCloskey was performing oral sex on defendant in the living room. The victim woke up and came into the living room, so defendant and McCloskey stopped as soon as they saw her and got dressed. Defendant took the victim back into the bedroom and apologized to her that she had seen what she did. Defendant told Hooks that defendant then went to take a bath, and when she came out of the bathroom, the victim told her that McCloskey had touched her between her legs with his hand and licked her between her legs. Hooks asked defendant why she had

not reported this, and defendant shook her head and said that "she didn't think [McCloskey] had done it or could do that." Defendant did not take the victim to a doctor. Defendant told Hooks that she confronted McCloskey regarding what the victim had told her and he denied it and said he did not know why the victim lied about him. Hooks testified that on or about 15 June 2004, she received a copy of McCloskey's handwritten confession from Detective Kerley and phoned defendant to ask about it. Hooks testified that during their phone conversation, defendant said that she had talked to McCloskey after his interview with Detective Kerley. Hooks further testified that defendant, changing her story slightly from the 13 May interview, said that when the victim came into the living room, the victim was not wearing her panties and that the victim touched defendant's naked vagina. Defendant also told Hooks that McCloskey "licked [the victim] between her legs and her vagina one time, and [defendant] told him to stop." Defendant further said that after this, she went to the bathroom, then she and McCloskey got dressed, the victim went to bed, and defendant told McCloskey that "it could never happen again."

Finally, the State called Lieutenant Cordelia Lewis of the Pender County Sheriff's Department to testify. Lt. Lewis testified regarding her investigation of the allegations of sexual abuse of the victim. Lt. Lewis received a report from the victim's paternal grandparents regarding the victim on a Sunday evening and she went to the victim's school to talk to her the following Tuesday. After talking to the victim, Lt. Lewis had made the report to DSS which served as the basis for Hooks' investigation. Lt. Lewis later talked to Detective Kerley and obtained a copy of the Apex police report and McCloskey's confession.

On 16 June 2004, Lt. Lewis and Hooks went together to defendant's home to talk to her. Defendant's story as recounted by Lt. Lewis was slightly different from the account defendant gave Hooks earlier. Defendant told Lt. Lewis at this meeting that McCloskey was performing oral sex on her when the victim walked in, but they did not know the victim was there. The victim then touched defendant on the thigh, not on her vagina. In response, defendant "sat up and asked [the victim] what she was doing." Defendant was upset and crying, and she went to the bathroom. When defendant returned from the bathroom, the victim was touching McCloskey's penis. Defendant asked "what are you-all doing?" and by the time she said this, McCloskey stopped. Defendant then took the victim into the bath-

room but the victim would not tell defendant anything. Defendant then told McCloskey to go to bed in his bed and that she and the victim would get in theirs. The next morning, on the way home, the victim asked if she and McCloskey could "play" again, and defendant told her no, "that would never happen again." Lt. Lewis testified that defendant said that she had lied before because she did not want to lose her daughter. Defendant signed a statement of her interview with Lt. Lewis.

Defendant testified on her own behalf at trial, offering a version of events again somewhat different from what Hooks and Lt. Lewis testified that she told them. Defendant admitted that she and the victim had visited with McCloskey for the weekend. She testified that the victim had walked into the bedroom when McCloskey was performing oral sex on defendant, that she realized the victim was there when she felt a touch on her thigh, and she pushed McCloskey back and sat up in bed. She was upset and started crying, hugged the victim, and then went into the bathroom because she was sick, leaving the victim and McCloskey in the room together. She took a shower and when she was coming down the hall returning to the bedroom, she could hear McCloskey and the victim talking but could not understand them. She heard McCloskey say "stop" and the victim jumped when defendant entered the room. She said she did not see anything happen, but "hollered at [the victim]. . . , 'what are you doing?' " She took the victim into the bathroom and talked to her, and she then asked McCloskey if he had done anything to the victim He denied that he had. Defendant denied her previous statements to Hooks regarding any knowledge of McCloskey having any form of sexual contact with the victim or of the victim touching defendant's vagina.

## II. Issues

Defendant has addressed in her brief only three of her six assignments of error. The three assignments of error not addressed in her brief are deemed abandoned. N.C.R. App. P. 28(b)(6). As to the remaining assignments of error, defendant contends that the trial court committed plain error by allowing a police detective to vouch for the veracity of McCloskey, the State's main witness. Defendant further contends that the trial court committed plain error by allowing Hooks, a social worker, to testify that defendant had not told her the truth. Finally, defendant contends that the trial court erred by sentencing defendant to consecutive terms for two counts of sexual offense which arose from the same transaction.

### III.  Admission of Evidence

A.  Testimony of Police Detective

[1] Defendant contends that she is entitled to a new trial because the trial court committed plain error when it allowed Detective Tim Kerley of the Apex Police Department to offer an opinion which tended to vouch for the veracity of McCloskey. We disagree.

At trial, the following testimony was elicited from Detective Kerley by the State:

Q.  Take the jury through what happened in your interview with Mr. McCloskey.

A.  When Mr. McCloskey arrived, I set him down and asked him some preinterview questions to basically see whether he was being deceptive. I asked him if he did do this to [the victim], and he denied it at first. After I determined that I thought he was deceptive, I came back and started asking him questions where he finally admitted to me that he and Audrey had done it to the little girl.

Q.  Can you tell the jury what you meant by you thought he was being deceptive?

A.  During the preinterview questions, I listened to how he answered the questions versus what a normal person would answer a question versus how a deceptive person would answer. Also the demeanor and how he acted when you asked those questions.

Q.  Things like body language and tone of voice play into that— those evaluations by you; is that right?

[Defense Counsel]:  Object to the leading, Your Honor.

THE COURT:  Well, don't lead him. Overruled, but don't lead him.

Q:  things do you look for in trying to determine whether or not a person is being deceptive or not?

A.  Just to—for example, I look for eye contact, whether they're looking straight at me when they're answering the question or they're looking down or somewhere else in the room; how they sit in the chair; if they are sitting still; if they adjust their movements while they're answering the questions; groping, grooming themselves, and things of that nature.

Q. What did you observe about Mr. McCloskey before—leading up to the point of where he started telling you what happened?

A. I observed Mr. McCloskey, to the best of my recollection—I'll have to go back and look at my report. He was very nervous. You know, his breathing was really hard, more so than what— an average person who hadn't done anything, in my *opinion*. I remember one time he did—he—a couple of times he did look down when he was answering those questions.

Q. At some point his demeanor changed; is that correct?

A. Yes, sir, to the best of my recollection.

. . .

Q. Okay. Now, at some point—earlier we talked a lot about his demeanor and how he was looking down. At some point after he said he would tell you the truth, what were your observations about his demeanor at that pint [sic]?

A. He was still nervous, as best I recall, but I don't think he was quite breathing as hard. I mean, I can give you my *impression* of why [McCloskey] told me the truth, if you want me to tell you that.

Q. Go ahead.

A. I felt like he really wanted to tell somebody what he did. You know, I felt like he felt guilty about it and just wanted to get it out and talk to somebody.

(Emphasis added.)

Defendant did not object at trial to this testimony from Detective Kerley. Therefore, this Court reviews only for plain error, N.C.R. App. P. 10(c)(4), which defendant correctly noted in her brief. In reviewing for plain error, this Court "must examine the entire record and determine if the . . . error had a probable impact on the jury's finding of guilt." *State v. Odom*, 307 N.C. 655, 661, 300 S.E.2d 375, 379 (1983).

Specifically, defendant argues that the foregoing testimony from Detective Kerley was an opinion. Defendant further argues that Detective Kerley was testifying as an expert, and therefore any opin-

ion testimony was limited to that permitted by Rule 702.[2] Alternatively, she argues that if Detective Kerley was testifying as a layman, then any opinion testimony was limited to that permitted by Rule 701. Defendant argues that whether Detective Kerley was testifying as an expert or a laymen, an opinion about the credibility of a witness is inadmissible under both Rule 701 or Rule 702, because such an opinion is not helpful to the jury. The State responds that Detective Kerley's testimony was a "shorthand statement of fact," not an opinion, and therefore not subject to the limits of either Rule 701 or Rule 702.

First, this Court must determine whether Detective Kerley was testifying as an expert. If he was, Rule 702 applies, if not, Rule 701 applies. Nothing in the record indicates that Detective Kerley was testifying as an expert; thus, Rule 701 is the proper rule to apply to the case *sub judice*. Rule 701 bars opinion testimony from a lay witness, except for "opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." N.C. Gen. Stat. § 8C-1, Rule 701.

Second, we must determine if the testimony of the witness is opinion, as opposed to fact. Broadly speaking, opinion testimony is a "belief, thought, or inference" drawn from a fact. *See Black's Law Dictionary* 579 (7th ed. 1999). Practically, however, labeling testimony as "fact" or "opinion," is often difficult " '[w]here a witness is attempting to communicate the impressions made upon his senses by what he has perceived.' " 2 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 175 n.3 (6th ed. 2004) (quoting *Am. L. Inst. Model Code of Evidence*, Rule 401, Comment c.).

Recognizing the difficulty of labeling impressions of demeanor as fact or opinion, our Supreme Court has stated:

"The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, *matters of fact*, and are admissible in evidence."

---

2. N.C. Gen. Stat. § 8C-1, Rule 702(a) states:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

*State v. Lloyd*, 354 N.C. 76, 109, 552 S.E.2d 596, 620 (2001) (emphasis added) (citation omitted) (testimony that defendant appeared calm is admissible). These types of instantaneous conclusions are usually referred to as "shorthand statements of facts," and are not opinions subject to Rule 701.[3] *State v. Braxton*, 352 N.C. 158, 187, 531 S.E.2d 428, 445 (2000), *cert. denied*, 531 U.S. 1130, 148 L. Ed. 2d 797 (2001). Detective Kerley testified that he concluded that because McCloskey was breathing less hard, he must have been less nervous. That inference was an instantaneous conclusion as to mental state, and legally speaking, a matter of fact. *Lloyd*, 354 N.C. at 109, 552 S.E.2d at 620; *see also Braxton*, 352 N.C. at 187, 531 S.E.2d at 445 (holding that testimony that defendant appeared calm and relaxed was admissible as a shorthand statement of fact). However, when Detective Kerley went on to his second inference, that because McCloskey became less nervous he must have been telling the truth, the testimony crossed the line and became an opinion. *See State v. Heath*, 316 N.C. 337, 343, 341 S.E.2d 565, 569 (1986) (distinguishing between an "opinion" about a mental condition and a "opinion" about credibility). Such an inference is not, legally speaking, a matter of fact, and is subject to the limits on lay opinion testimony found in Rule 701. *Id.*

Third, we must determine if Detective Kerley's lay opinion testimony is nonetheless admissible because it falls within the exception found in Rule 701. On this issue, our Supreme Court has determined that when one witness "vouch[es] for the veracity of another witness," such testimony is an opinion which is not helpful to the jury's determination of a fact in issue and is therefore excluded by Rule 701. *State v. Robinson*, 355 N.C. 320, 335, 561 S.E.2d 245, 255, *cert. denied*, 537 U.S. 1006, 154 L. Ed. 2d 404 (2002); *see also* N.C.P.I., Crim. 101.15 (2005) (The jury is the "sole judge[] of the credibility . . . of each witness," and the jury should test the truthfulness of a witness by, among other things, observing "the manner and appearance of the witness."); *State v. White*, 154 N.C. App. 598, 605, 572 S.E.2d 825, 831 (2002) ("The jury is charged with drawing its own conclusions from the evidence, and without being influenced by the conclusion of [a law enforcement officer].")

Detective Kerley testified, "I don't think he was quite breathing as hard. I mean, I can give you my impression of why [McCloskey] told

---

3. To illustrate the difficulty of labeling some testimony as opinion or fact, we note that in some cases, testimony determined to be a "shorthand statement of fact" is labeled an "opinion" which is nevertheless admissible because such testimony meets the exception found in Rule 701. *See, e.g.*, *State v. Eason*, 336 N.C. 730, 747, 445 S.E.2d 917, 927 (1994), *cert. denied*, 513 U.S. 1096, 130 L. Ed. 2d 661 (1995).

STATE v. GOBAL

[186 N.C. App. 308 (2007)]

me the truth . . . . I felt like he felt guilty about it and just wanted to get it out." This is an opinion which vouches for the veracity of a witness. However, the jury was able to see for itself the manner and appearance of McCloskey when he testified, and determine for itself if it wanted to believe him. Therefore, the opinion as to his credibility was not helpful to the jury's determination of a fact in issue. Accordingly, we hold that the admission of this testimony was error.

Having concluded that the admission of the testimony was error, we must determine whether the error was plain error. In other words, whether it was probable, absent this error, that the jury would have reached a different verdict than the one it actually reached. *Odom*, 307 N.C. at 661, 300 S.E.2d at 379. Though this case ultimately rested on whether the jury chose to believe the story of McCloskey or that of defendant, defendant's credibility was impeached in many different ways: by the tape of her own voice seeking to mislead McCloskey into thinking that he was the father of her child and encouraging McCloskey to lie, by the testimony of Hooks and Lt. Lewis which revealed inconsistencies in defendant's story, and by defendant's own inconsistent testimony. Given the amount of testimony which directly or indirectly impeached defendant, the jury had ample evidence, besides the testimony of Detective Kerley, which might have caused it to disbelieve the story of defendant and believe the story of McCloskey. We find no plain error.

B. Testimony of Social Worker

[2] Defendant's next assignment of error regards the following testimony of social worker Hooks during cross-examination by defendant.

Q: Ms. Gobal—Audrey Gobal complied with all your requests; is that correct? Well, strike that.

A: Technically, no. She didn't tell us the truth from the very beginning. No.

Defendant contends that this testimony was improper character evidence which should not have been admitted.

Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law. *State v. Greene*, 324 N.C. 1, 11, 376 S.E.2d 430, 437 (1989), *vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990); *see also State v. Chatman*, 308 N.C. 169, 177, 301 S.E.2d 71, 76 (1983) (holding that the defendant could not assign er-

ror to testimony elicited during defense counsel's cross-examination of the State's witness); N.C. Gen. Stat. § 15A-1443(c) (2005). This assignment of error is without merit.

## IV. Consecutive Sentences

[3] Finally, defendant argues that the trial court erred by sentencing her to consecutive terms of imprisonment for the two counts of first-degree sexual offense, because the constitutional guaranty against double jeopardy prohibits multiple sentences for a single offense.[4] Defendant cites *dicta* in *State v. Petty*, 132 N.C. App. 453, 463, 512 S.E.2d 428, 434, *disc. review denied and appeal dismissed*, 350 N.C. 598, 537 S.E.2d 490 (1999), for the proposition that the two first-degree sexual offenses charged, cunnilingus and fellatio, are not disparate crimes, but merely alternative ways of showing the commission of a sexual act.[5] Defendant reasons that if both cunnilingus and fellatio occur as part of a single transaction, then only one offense has been committed. Defendant contends that the events of 2 April 2004 were a single transaction and concludes that one offense has been committed, for which she can receive only one sentence.

Constitutional issues[6] not raised and passed upon at trial will not be considered for the first time on appeal, *State v. Lloyd*, 354 N.C. 76, 86-87, 552 S.E.2d 596, 607 (2001), not even for plain error, *State v. Cummings*, 352 N.C. 600, 613, 536 S.E.2d 36, 47 (2000). A "double

---

4. Defendant did not identify this issue in her assignments of error or brief as a double jeopardy question, but instead relied on cases addressing issues of jury unanimity, basing her argument only upon the contention that the two offenses arose out of a single transaction. We address this issue as a double jeopardy question, because "[t]he nature of the action is not determined by what either party calls it, but by the issues arising on the pleadings and by the relief sought." *Hayes v. Ricard*, 244 N.C. 313, 320, 93 S.E.2d 540, 545-46 (1956).

5. We note that the case *sub judice* does not involve any question of unanimity of the jury verdict, which was the specific issue addressed by *Petty* and *State v. Hartness*, 326 N.C. 561, 563-64, 391 S.E.2d 177, 178 (1990), the only cases upon which defendant based her argument. *See State v. Howell*, 169 N.C. App. 58, 62, 609 S.E.2d 417, 420 (2005) (*"Petty* . . . addressed whether a first-degree sexual offense is a single wrong for jury unanimity purposes and thus is inapposite" to the issue of multiplicious charges for possession of child pornography.); *see State v. Lyons*, 330 N.C. 298, 303, 412 S.E.2d 308, 312 (1991) (*Hartness* and its line of cases "establish[ ] that if the trial court merely instructs the jury disjunctively as to various alternative acts *which will establish an element of the offense*, the requirement of unanimity is satisfied." (Emphasis in original.))

6. Defendant assigned error to the "multiplicious indictment . . . in violation of [her] State and Federal rights." She further argued in her brief that "[t]he principle danger in multiplicity is that the defendant will receive multiple sentences for a single offense."

jeopardy argument [need not] us[e] those exact words [to be pre-
served for appeal, if] the substance of the argument was sufficiently
presented and, *more importantly, addressed by the trial court in
finalizing its instructions to the jury.*" *State v. Ezell*, 159 N.C. App.
103, 106, 582 S.E.2d 679, 682 (2003) (emphasis added).

The trial transcript reads, in pertinent part:

THE COURT: [T]he substantive offenses are the two B1s of first-
degree statutory sex offense. One would be as to cunnilingus; one
would be as to fellatio, both with an aiding-and-abetting element.
I don't know of any lesser included or any other subtleties. What
do you-all say? It's either all or nothing, isn't it?" What says the
state, and what says the defendant? Do you agree?

Defense Counsel: Your Honor, I think you got it on that.

. . .

THE COURT: The second full paragraph is where I first talk
about the offenses, and you'll see as to each of the first two
counts I talk about them being, one, cunnilingus, one fellatio,
both by aiding and abetting. [The Court discusses the instructions
step-by-step with counsel for each side.] [I]n the second count or
charge, it's the very same charge except it talks—it says this one's
in the form of fellatio. Otherwise, it's verbatim except the ele-
ments of fellatio instead of cunnilingus. [The Court continues
step-by-step discussion.] What says defendant?

Defense Counsel: Your Honor, *we don't have any objection to the
charge*—to the proposed charge . . . [a]nd *the verdict sheets seem
to be okay.*

[The jury returns for closing arguments, is instructed, and retires
to deliberate.]

THE COURT: Any further request, objections or anything
from . . . the defendant?

[The jury deliberates and returns the verdict.]

Defense Counsel: Your Honor, the defendant at this time would
ask the Court to set aside each and every verdict of the jury
on the grounds that the verdicts . . . are not supported by suffi-
cient evidence.

. . .

THE COURT: I'll take that under advisement.

[The jury is dismissed, and sentencing begins.]

Defense Counsel: [W]e would ask the Court to be merciful. . . . It's a very sad situation. . . . *That's about all I have to say,* Your Honor.

. . . .

[Defense Counsel declines to be heard further on the motion to set aside the verdict.]

THE COURT: That motion [to set aside the verdict] is denied. The judgment of the Court is that with regard to . . . the jury finding . . . is th[at] defendant be imprisoned.

. . .

Defense Counsel: Your Honor, I would like to point out it all happened at one time.

THE COURT: I understand. I understand. [The Court reviews the verdicts and announces the sentences.]

Defendant's vague passing mention of this issue *after* the jury had been instructed, returned its verdict, and been dismissed from the courtroom is not sufficient to persuade us that defendant raised this constitutional issue to the trial court. Defendant has thus failed to preserve this assignment of error for appellate review. *See State v. Fullwood,* 343 N.C. 725, 733, 472 S.E.2d 883, 887 (1996), *cert. denied,* 520 U.S. 1122, 137 L. Ed. 2d 339 (1997). Defendant's final assignment of error is overruled.[7]

For the reasons stated above, we hold that the trial court did not commit plain error when it admitted Detective Kerley's testimony which tended to vouch for the veracity of McCloskey. We further hold

7. If defendant had properly preserved this issue for appeal, we would affirm the judgment and sentence of the trial court. Even when multiple sex acts occur in a "single transaction" or a short span of time, each act is a distinct and separate offense. *Compare State v. James,* 182 N.C. App. 698, 704-05, 643 S.E.2d 34, 38 (2007) (fondling the victim's breasts, performing oral sex on the victim, and forcing sexual intercourse on the victim were three separate and distinct offenses even when they occurred in a single episode), *and State v. Dudley,* 319 N.C. 656, 659, 356 S.E.2d 361, 363 (1987) (Each penetration, however slight, of the victim's vagina by the defendant's penis is a separate and distinct offense even when they occur in a single continuous incident.), *with State v. Laney,* 178 N.C. App. 337, 341, 631 S.E.2d 522, 524 (2006) (touching the breasts of the victim through her shirt and putting a hand inside the waistband of her pants amounts to only one offense).

that defendant invited any error which she assigned to the testimony of Hooks, the social worker. Finally, we hold that defendant failed to preserve the constitutional question of double jeopardy for appellate review. Accordingly, defendant received a fair trial and her convictions are affirmed.

No Error.

Chief Judge MARTIN concurs.

Judge HUNTER concurring in part and dissenting in part in a separate opinion.

HUNTER, Judge, concurring in part and dissenting in part.

I agree with the majority that Audrey Gobal's ("defendant") trial was free from prejudicial error as it pertains to the admission of Detective Kerley's testimony and to the admission of Keisha Hooks's testimony. I disagree, however, with the majority's conclusion that the issue of sentencing is not properly before this Court. Instead, I would hold that the issue has been properly preserved for appellate review and that defendant's indictment was multiplicious and would therefore vacate one of defendant's convictions for first degree sexual offense and remand for resentencing.

The majority bases its conclusion that the sentencing issue is not properly before this Court on the grounds that defendant did not raise the constitutional issue of double jeopardy to the trial court and, as such, has failed to preserve that argument for appellate review. Defendant, however, does not raise the issue of double jeopardy to this Court but instead argues that her indictment was multiplicious.

The issues in this case are: (1) whether the issue of sentencing is properly before this Court; (2) whether the statutory definition of "sexual act" creates disparate offenses or whether it enumerates the methods by which the single wrong of engaging in a sexual act with a child may be shown; and (3) if the statutory definition of "sexual act" does not create disparate offenses, whether the acts of cunnilingus and fellatio committed by defendant against the victim occurred in the same transaction, thus rendering her indictment multiplicious.

I.

The majority contends that defendant is making a double jeopardy argument and that it has been waived because it was not

properly preserved.[8] Defendant asserts in assignment of error number 6 that her indictment was multiplicious. During the sentencing hearing, defense counsel made the substance of a multiplicity argument when he stated that the sexual acts "all happened at one time." Accordingly, I would address defendant's contention that her indictment was multiplicious.

## II.

In this case, the jury convicted defendant, *inter alia*, of two counts of first degree sexual offense in violation of N.C. Gen. Stat. § 14-27.4(a)(1) (2005), for which the trial court imposed consecutive sentences. A person will be guilty of a first degree sexual offense if the person engages in a *sexual act* "[w]ith a victim who is a child under the age of 13 years and the defendant is at least 12 years old and is at least four years older than the victim[.]" N.C. Gen. Stat. § 14.27.4(a)(1). A "sexual act" is defined as, *inter alia*, cunnilingus and fellatio. N.C. Gen. Stat. § 14.27.1(4) (2005). The State alleged that the two sexual acts committed by defendant, cunnilingus and fellatio, warrant two separate charges for first degree sexual offense. Defendant, however, argues that the alleged sexual acts of cunnilingus and fellatio occurred during the same transaction so that the State could only indict her on one count of first degree sexual offense.

An indictment will be multiplicious if it charges a single offense in multiple counts. *State v. Petty*, 132 N.C. App. 453, 463 n.2, 512 S.E.2d 428, 435 n.2 (1999). As with the dangers guarded against by the double jeopardy clause, " '[t]he principal danger in multiplicity is that the defendant will receive multiple sentences for a single offense[.]' " *Id.* (quoting 2 Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 19.2, at 457-58 (1984)). Where an indictment is multipli-

---

8. Assuming, as the majority has, that defendant's actual argument is one of double jeopardy, I disagree with the majority's contention that the issue has been waived. The merits of a double jeopardy defense may be reviewed by an appellate court even where a defendant does not "us[e] those exact words," so long as "the substance of the argument was sufficiently presented and, more importantly, addressed by the trial court in finalizing its instructions to the jury." *State v. Ezell*, 159 N.C. App. 103, 106, 582 S.E.2d 679, 682 (2003). The substance of the argument was made when defense counsel said that the alleged sexual acts "all happened at one time"; the trial court instructed the jury on the double jeopardy issue when it told the jury "that for you to convict the defendant of more than one of the offenses charged *you must find that each offense constituted a separate and distinct criminal act,* and you must weigh the evidence of each alleged offense separately and apart from any other." (Emphasis added.)

cious, a defendant is not entitled to a dismissal of the indictment but will be entitled to relief from the improper sentence. *Id.*

A.

This Court has already stated that the "statutory definition of 'sexual act' does not create disparate offenses, rather it enumerates the methods by which the single wrong of engaging in a sexual act with a child may be shown." *Petty*, 132 N.C. App. at 462, 512 S.E.2d at 434; *see also State v. Youngs*, 141 N.C. App. 220, 233, 540 S.E.2d 794, 802 (2000) (same). Accordingly, it has also been held that "disjunctive jury instructions do not risk nonunanimous verdicts in first-degree sexual offense cases." *Petty*, 132 N.C. App. at 462, 512 S.E.2d at 434 (citing *State v. McCarty*, 326 N.C. 782, 784, 392 S.E.2d 359, 360 (1990) "(upholding jury instruction that the defendant could be found guilty of first-degree sexual offense 'if [the jury] found [the] defendant [had] engaged in either fellatio or vaginal penetration')"); *State v. Hartness*, 326 N.C. 561, 565, 391 S.E.2d 177, 179 (1990) (holding that disjunctive instructions did not result in a fatally ambiguous verdict in an indecent liberties case, and noting that the indecent liberties statute is "more similar to the statute relating to first-degree sexual offense . . . than to the trafficking statute discussed in *Diaz*"). It also then follows that because "first-degree sexual offense is a single wrong for unanimity purposes [it] requires us to conclude that charging a defendant with a separate count of first-degree sexual offense for each alternative sexual act performed in a single transaction would result in a multiplicious indictment."[9] *Petty*, 132 N.C. App. at 463, 512 S.E.2d at 435 (footnote omitted). Thus, I would next determine whether the acts committed by defendant in this case occurred during the same transaction.

---

9. This Court, in *State v. James*, 182 N.C. App. 698, 704-05, 643 S.E.2d 34, 38 (2007), has reached a different conclusion as it pertains to the criminal violation of taking indecent liberties with a child. Although that Court was addressing a multiplicity argument, I would find it distinguishable from the instant case because *James* dealt with N.C. Gen. Stat. § 14-202.1(a)(1)-(2) (indecent liberties with children statute) and not N.C. Gen. Stat. § 14-27.4(a)(1) (first degree sexual offense statute). Moreover, the *James* Court, in rejecting the defendant's multiplicity argument, applied a rule used to determine whether a double jeopardy violation had occurred where the same act or transaction constitutes a violation of *two distinct statutory provisions*, a rule that is inapplicable to the determination of whether an indictment was multiplicious. *See James*, 182 N.C. App. at 704, 643 S.E.2d at 38 (citing *State v. Etheridge*, 319 N.C. 34, 50, 352 S.E.2d 673, 683 (1987)). Accordingly, I would find *James* distinguishable from the instant case on this ground as well.

### B.

In this case, the evidence presented at trial tended to show the acts of fellatio and cunnilingus occurred during the same transaction, and under the reasoning of *Petty*, I would hold that the indictment was multiplicious. On 2 April 2004, defendant and her boyfriend, John Paul McCloskey ("McCloskey"), went into his bedroom with the victim. Once in the bedroom, McCloskey performed cunnilingus upon defendant. The victim then said, " 'I can take care of Mom from here,' " and she then began to masturbate defendant while McCloskey kissed defendant. McCloskey then performed cunnilingus upon defendant and the victim. The victim then performed fellatio on McCloskey for five or six minutes. There was a gap of approximately three to five minutes between the acts of cunnilingus and fellatio. During this time, there was no break in sexual acts between defendant and her boyfriend, and the victim remained nearby. Under these circumstances, I would hold that the sexual acts occurred during a single transaction. Accordingly, defendant's indictment was multiplicious because she was charged with two separate counts of first degree sexual offense in a single indictment when each alternative sexual act occurred during a single transaction. I would therefore vacate one of defendant's convictions for first degree sexual offense and remand for resentencing.

### III.

The majority has concluded that defendant's argument is one of double jeopardy and not multiplicity. Due to the similarities between the two arguments, this Court has addressed them under the same standard. *See State v. Howell*, 169 N.C. App. 58, 61, 609 S.E.2d 417, 419 (2005). For the reasons discussed in footnote two of this dissent, I would address whether defendant was convicted in violation of the double jeopardy clause.

"Both the fifth amendment to the United States Constitution and article I, section 19 of the North Carolina Constitution *prohibit multiple punishments for the same offense* absent clear legislative intent to the contrary."[10] *Etheridge*, 319 N.C. at 50, 352 S.E.2d at 683 (emphasis added); *see also Ezell*, 159 N.C. App. at 106, 582 S.E.2d at 682 (same). "Our courts consider the 'gravamen' or 'gist' of the statute to determine whether it criminalizes a single wrong or multi-

---

10. The double jeopardy clause also "prohibits (1) a second prosecution for the same offenses after acquittal; [and] (2) a second prosecution for the same offense after conviction[.]" *Ezell*, 159 N.C. App. at 106, 582 S.E.2d at 682.

ple discrete and separate wrongs." *Petty*, 132 N.C. App. at 461, 512 S.E.2d at 434.

"Section 14-27.4's gravamen, or gist, is to criminalize the performance of a sexual act with a child." *Id.* at 462, 512 S.E.2d at 434. As stated above, "[t]he statutory definition of 'sexual act' does not create disparate offenses, rather it enumerates the methods by which the single wrong of engaging in a sexual act with a child may be shown." *Id.* Accordingly, if defendant engaged in the sexual act in one transaction, then she could not be convicted on two counts of first degree sexual offense. On the other hand, if defendant engaged "in alternative sexual acts in separate transactions . . . each separate transaction may properly form the basis for charging the defendant with a separate count of first-degree sexual offense." *Id.* at 463, 512 S.E.2d at 435.

For the reasons discussed in section IIB of this dissent, I would find that the acts of cunnilingus and fellatio occurred during a single transaction. Accordingly, defendant was convicted twice for a single offense in violation of the double jeopardy clause, and I would remand with instructions to vacate one first degree sexual offense conviction and to resentence defendant.

IV.

In summary, I would hold that defendant's indictment was multiplicious and would remand for resentencing on that ground. In the alternative, I would hold that the issue of double jeopardy is properly before this Court and that defendant's convictions on two counts of a first degree sexual offense arising out of the same transaction violated the double jeopardy clause and would thus vacate one conviction and remand for resentencing. For the foregoing reasons, I respectfully dissent as to these issues.