An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1290

NORTH CAROLINA COURT OF APPEALS

Filed: 5 August 2014

STATE OF NORTH CAROLINA

v.

VELETTA WILKINS EDWARDS,
    Defendant.

Sampson County
Nos. 11 CRS 50400—402; 12 CRS
1596, 1599—1601

Appeal by defendant from judgments entered 5 June 2013 by Judge Kenneth F. Crow in Sampson County Superior Court. Heard in the Court of Appeals 4 June 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Laura Edwards Parker, for the State.*

> *Mark Montgomery for defendant-appellant.*

BRYANT, Judge.

Where defendant's cross-examination of an expert witness invites the testimonial error about which she now complains on appeal, there can be no plain error in the admission of such testimony.

On 26 November 2012, defendant Veletta Wilkins Edwards was indicted on two counts of sexual offense with a child by an adult under N.C. Gen. Stat. § 14-27.4A, and six counts of felony child abuse inflicting serious bodily injury under N.C. Gen. Stat. § 14-318.4(a)(3). The charges came on for trial during the 28 May 2013 criminal session of Sampson County Superior Court, the Honorable Kenneth F. Crow, Judge presiding. At trial, the State's evidence tended to show the following.

In May 2009, T.J. and her sister S.V.[1] were removed from their mother's home due to allegations of neglect and placed with defendant, their grandmother. T.J. was about eight years old, and her sister S.V. about nine years old, when they went to live with defendant.

On 28 December 2010, the Sampson County Department of Social Services ("DSS") received a report alleging emotional abuse and improper discipline at defendant's home. The following day, DSS social workers Gilmore and Blackmon went to defendant's home to investigate the allegations. Upon arriving at the home, the social workers found that while S.V. appeared to be well-dressed and healthy, T.J. was thin and unkempt, had wounds on her face, hand, and ear, her hair was thin and

---

[1] Initials are used to protect the identities of the juveniles pursuant to N.C. R. App. P. 3.1(b) (2014).

"crispy," and she walked with a limp. The social workers reported that defendant's home was very cluttered and unkempt, that there were no beds for either child, and that the door to T.J.'s room was being latched and padlocked from the outside of the room.

Defendant acted agitated and frantic during the social workers' visit, telling them that "This needed to happen." When questioned by Blackmon about the allegations of emotional abuse and improper discipline, defendant stated that she had "spanked [T.J.] worse than she had wanted to[,]" she had stopped taking both girls to therapy sessions, and that she kept T.J. locked in her room with the padlock. Defendant then became defensive, telling Blackmon that "You don't know anything about what I've been going through with [the girls.]" Defendant also stated she thought T.J. had multiple personalities and was schizophrenic. Gilmore testified that when he and Blackmon left with the girls, defendant told only S.V. that she loved her.

Upon arriving at DSS, Gilmore testified that T.J. immediately began to ask for food, eventually consuming a piece of cake and two children's meals from a local fast-food restaurant. Gilmore and his colleagues then performed a body inventory of the children. S.V. was documented as having "clear,

[] pretty skin" with no extant injuries. However, when Gilmore began to examine T.J., he found multiple injuries. T.J. was documented as having thin, damaged hair with a yellow, lesion-crusted scalp; injuries across her forehead; and her skin was, in general, dry and flaky. A bandage on T.J.'s left ear emitted an odor; upon removing the bandage, Gilmore noticed the ear was extremely swollen, with blood and pus oozing from a large injury. T.J. also had significant injuries to her left arm, front and back torso, chest, right arm, lower back, and legs; these injuries were described as burns in varying stages of healing. Gilmore found an open wound on one of T.J.'s feet, and noted a large, open wound on her left pinky finger. When asked how she received these injuries, T.J. told Gilmore that a boy had bitten her ear and she had accidentally burned herself with hot water in the shower. However, T.J. then told Blackmon that some of her injuries were caused by defendant hitting her with a belt.

DSS took T.J. to the hospital for treatment. At the hospital, T.J. was found to have further injuries to her feet and toes.

The next day, on 30 December, T.J. was taken to see her regular family doctor, Dr. Bryan. Dr. Bryan testified that when

she saw T.J. that day, T.J. looked "vastly different" from when she had last seen her. Dr. Bryan stated that T.J. was covered in serious injuries and was in obvious pain, and that many of the large scars on T.J.'s arms and torso appeared to be burns. T.J. became upset when she saw Dr. Bryan and told her that she had lied to people about her injuries. T.J. told Dr. Bryan that defendant had burned her with hot water in the bathtub, choked her around the neck, and had bitten her ear. She also told Dr. Bryan that defendant kept her locked in her room because she was stealing food and that defendant had refused to let T.J. use the bathroom. During a follow-up visit at DSS, T.J. told Blackmon that defendant had burned her with hot water, bitten her ear, and pinched her fingers and toes with pliers. DSS placed the girls with a foster family. The foster family testified that T.J. repeated her allegations of defendant's abuse to them.

On 7 January 2011, DSS interviewed defendant. Defendant was agitated during the interview and refused to let her husband answer any questions. Defendant told Blackmon that she kept T.J. locked in her room because T.J. had stolen a knife from the kitchen and defendant was afraid for her life. After Blackmon

repeatedly asked defendant to explain T.J.'s injuries, defendant and her husband walked out of the interview.

On 18 January 2011, T.J. was evaluated by pediatrician Dr. Loughlin. Dr. Loughlin testified to what T.J. told him: that defendant had put T.J.'s head into the toilet and flushed it, making T.J. believe she would drown. Defendant would also hold T.J's head under water in the bathtub until she passed out. Defendant would pour hot water on her and make her sit in hot water in the bathtub until her skin would stick to the surface of the bathtub. Defendant would sometimes pour hot water mixed with bleach or ammonia on T.J's forehead. T.J. also told Dr. Loughlin about defendant biting her ear on multiple occasions, using pliers to pinch her fingers and toes, and hitting her legs and knees with pliers and a hammer. T.J. told Dr. Loughlin that defendant had removed T.J.'s clothes, restrained her with duct tape, and placed her on an ant mound so she could be, and indeed was, bitten by ants.

S.V. was also evaluated by Dr. Loughlin. S.V. stated that she had also been beaten by defendant, had seen defendant "drowning" T.J., and had seen defendant sticking pushpins into T.J.'s thighs. S.V. told Dr. Loughlin that defendant had

directed S.V. to bring her boiling water when T.J. was in the bathtub.

T.J. was also interviewed by Detective Godwin of the Sampson County Sheriff's Department. T.J. told Detective Godwin that defendant had put the handle of a purple hairbrush into her vagina and her anus several times, and that it had hurt very badly. T.J. told Detective Godwin that defendant also put the handle of a straight razor into her vagina and anus. When asked why she had not told anyone of those particular sexual acts before, T.J. said that she "really just didn't feel comfortable talking about it[.]"

On 28 January 2011, Detective Godwin went to defendant's house to execute a search warrant. Defendant asked Detective Godwin if he was looking for a purple hairbrush. She then stated that the hairbrush belonged to T.J., and it was in one of T.J.'s bags. Defendant could not find the hairbrush in the bag and said she must have misplaced it; the hairbrush was never found. A pair of pliers was removed from the home, and bottles of bleach and ammonia were found in the bathroom.

Defendant was convicted by a jury on all charges. The trial court sentenced defendant to consecutive terms of: 300 to 369 months for each count of sexual offense with a child by an

adult; and 73 to 97 months for each count of felony child abuse. Defendant appeals.

_____

Defendant's sole contention on appeal is that the trial court allowed an expert witness to testify that children do not fabricate stories of abuse and, thereby, committed plain error. We disagree.

Defendant failed to object at trial to the witness testimony she now challenges on appeal. This Court reviews a defendant's failure to object to evidence for plain error. *See State v. Locklear,* 172 N.C. App. 249, 259–60, 616 S.E.2d 334, 341 (2005). "[T]he plain error standard of review applies on appeal to unpreserved instructional or evidentiary error." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012).

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty.

*Id.* (citations and quotations omitted); *see also State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation, quotations, and emphasis omitted).

Defendant contends the trial court committed plain error in permitting Dr. Loughlin to testify that "children typically don't just fabricate stories about -- about what's happened to them." When an expert witness testifies as to the sexual abuse of a victim, this Court has held that "[a]n expert may not testify that a child victim of abuse is believable, credible, or telling the truth because this violates the teachings of N.C. Gen. Stat. § 8C-1, Rules 405 and 608(a)." *State v. O'Connor*, 150 N.C. App. 710, 712, 564 S.E.2d 296, 297 (2002) (citations and quotation omitted). However, an expert may testify as to the credibility of children in general. *State v. Oliver*, 85 N.C. App. 1, 11—13, 354 S.E.2d 527, 533—34 (1987). An expert may also testify "as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." *State v. Stancil*, 355 N.C. 266, 267, 559 S.E.2d 788, 789 (2002) (*per curiam*). Further, an expert may, upon observing physical evidence of sexual abuse, testify that a child has been sexually abused. *Id.* at 266—67, 559 S.E.2d at 789.

At trial, the State tendered Dr. Loughlin as an expert witness and questioned him regarding his evaluation of T.J. On

defendant's cross-examination of Dr. Loughlin, the following exchange occurred:

> Q. Okay. And I believe your testimony was that the examination was not consistent with sexual abuse or inconsistent with sexual abuse?
>
> A. The way I'll frequently phrase it for the record is that the normal exam neither supports nor refutes the possibility of sexual abuse.
>
> Q. And in this case, it did neither?
>
> A. That's correct.
>
> Q. How could an examination refute?
>
> A. There would be some who would want to interpret a normal physical exam as evidence against sexual abuse, and that's what I'm saying, it would not be valid in my opinion. Of course, a normal exam is consistent with a child who has been sexually abused.
>
> Q. But there's never going to be a physical exam that's inconsistent with sexual abuse?
>
> A. That's correct.
>
> Q. Okay. You said it was not uncommon for a child to deny abuse?
>
> A. That's -- that's correct.
>
> Q. So it's also not uncommon for a child to wait a long time before bringing forward abuse; is that correct?
>
> A. That's -- that's true. Disclosure can be a

> process that can start anywhere along the way.
>
> Q. It would not be uncommon for a child to allege abuse early on?
>
> A. No. Some children will tell right after something happens, others will not.
>
> Q. And it would not be uncommon to make up allegations of abuse?
>
> A. I don't think I'd agree with that statement. I think children typically don't just fabricate stories about -- about what's happened to them.

Here, not only did defendant ask questions of the witness and thereby "invite" the error of which she now complains, she did not ask for a limiting instruction when the witness disagreed with the premise of her question that "it would not be uncommon [for children] to make up allegations of abuse[.]" *See State v. Dew*, ___ N.C. App. ___, ___, 738 S.E.2d 215, 221 (2013) ("[a] defendant is not prejudiced by . . . error resulting from his own conduct. As a result, a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review." (citations and quotations omitted)), *review denied*, 366 N.C. 595, 743 S.E.2d 187 (2013); *State v. Global*, 186 N.C. App. 308, 319–20, 651 S.E.2d 279, 287 (2007) ("Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot

be prejudiced as a matter of law." (citations omitted)); *State v. Payne*, 280 N.C. 170, 171, 185 S.E.2d 101, 102 (1971) ("[O]ne who causes . . . the court to commit error is not in a position to repudiate his action and assign it as ground for a new trial. The foregoing is not intended as any intimation the court committed error in this instance; but to point out the legal bar to the defendant's right to raise the question. Invited error is not ground for a new trial." (citations omitted)).

Nevertheless, assuming *arguendo* we reviewed this issue for plain error, we would not find prejudicial error. Defendant asked Dr. Loughlin a series of questions regarding how children generally respond to abuse. When defendant asked Dr. Loughlin whether "it would not be uncommon to make up allegations of abuse," Dr. Loughlin responded: "I think children typically don't just fabricate stories . . . about what's happened to them." As such, Dr. Loughlin's statement is not a statement as to the credibility of T.J., but rather a statement of opinion that "children typically don't just fabricate stories[.]" Moreover, it is clear from the exchange between defendant and Dr. Loughlin that this line of questioning was meant to explore the credibility of children in general, rather than just the

individual credibility of T.J. *See Oliver*, 85 N.C. App. at 11—13, 354 S.E.2d at 533—34.

Further, even absent the challenged testimony of Dr. Loughlin, there was sufficient evidence of defendant's guilt that there was no probability a different result would have been reached. The State presented evidence through the testimony of the victim, T.J.; T.J.'s sister S.V.; social workers Gilmore and Blackmon; Detective Godwin; T.J.'s foster family; and T.J.'s primary care doctor, Dr. Bryan. The testimony of torture and abuse was as revolting as it was overwhelming. Therefore, even had defendant not invited the error about which she now complains, we would have to find that the trial court did not commit plain error in admitting the challenged testimony of the expert witness.

No error.

Judges CALABRIA and GEER concur.

Report per Rule 30(e).