An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-1294

Filed: 15 September 2015

Onslow County, No. 11 CRS 54362

STATE OF NORTH CAROLINA

v.

EDWIN JIMENEZ

Appeal by defendant from judgment entered 22 April 2014 by Judge Paul L. Jones in Onslow County Superior Court. Heard in the Court of Appeals 21 April 2015.

*Roy Cooper, Attorney General, by Natalie Whiteman Bacon, Assistant Attorney General, for the State.*

*Paul F. Herzog for defendant-appellant.*

DAVIS, Judge.

Edwin Jimenez ("Defendant") appeals from his conviction for taking indecent liberties with a child. On appeal, he contends that the trial court (1) erred in admitting evidence of his possession of three pornographic DVDs; and (2) committed plain error in permitting a lay witness to give expert testimony. After careful review, we conclude that Defendant received a fair trial free from prejudicial error.

**Factual Background**

The State presented evidence at trial tending to establish the following facts: In July 2008, Defendant and his wife, Priscilla Musto ("Musto"), resided in Sneads Ferry, North Carolina. From 5 July through 31 July 2008, Musto's younger half-sister, E.S.[1] — who normally lived with her mother in New York — stayed with Defendant and Musto at their home in Sneads Ferry. E.S. was 15 years old at the time.

Throughout the course of her stay with Defendant and Musto, E.S. experienced multiple incidents of sexual abuse by Defendant. E.S. testified that this abuse included Defendant (1) feeling her breast and digitally penetrating her vagina in the guest room of Defendant's and Musto's home; (2) regularly coming into her bedroom in the early morning hours while she was sleeping and digitally penetrating her vagina while he simultaneously masturbated; (3) taking her into the garage on several occasions and forcing her to perform oral sex upon him; and (4) on one occasion, taking her into his bedroom, forcing her to remove her clothes, and then inserting the tip of his penis into her vagina.

E.S. did not report Defendant's actions to anyone while she was staying with Defendant and Musto. In August 2008, E.S. returned home to New York.

On 21 September 2010, E.S. recounted several details of Defendant's sexual abuse to a high school social worker, Michele Morris ("Morris"). Morris reported

---

[1] Initials are used throughout this opinion to protect the identity of the victim who was a minor during the incidents at issue.

Defendant to "the [New York] children's services department . . . the [New York] police department . . . child services in North Carolina . . . and the [North Carolina] police department," submitting a written statement concerning E.S.'s allegations to the Onslow County Sheriff's Office. E.S. met regularly with Morris throughout the ensuing school year and continued to disclose additional details about Defendant's abuse over the course of their meetings.

On 21 June 2011, E.S. returned to North Carolina and met with Sergeant Mark Perrigo ("Sergeant Perrigo") of the Onslow County Sheriff's Office. At Sergeant Perrigo's request, E.S. provided a written statement describing Defendant's abusive actions. The statement alleged, in part, that during July 2008, Defendant digitally penetrated her vagina and forced her to perform oral sex upon him.

On 24 June 2011, Detective John Getty ("Detective Getty") with the Onslow County Sheriff's Office's Juvenile Division reviewed E.S.'s statement and conducted a telephone interview with her. During the course of the interview, E.S. repeated her allegations of sexual abuse by Defendant. After interviewing E.S., Detective Getty obtained statements from Morris, Musto, George Contreras ("Contreras") (Musto's father), and Linda Swiggett ("Swiggett") (a former neighbor and family friend of Defendant and Musto) as part of his investigation into E.S.'s allegations.

On 8 May 2012, Defendant was indicted on three counts of taking indecent liberties with a child. Defendant was also charged with three counts of statutory rape

and three counts of crime against nature. A jury trial was held in Onslow County Superior Court before the Honorable Paul L. Jones on 13 April 2014.

At trial, the State offered testimony from, among other witnesses, E.S., Morris, Sergeant Perrigo, Contreras, Swiggett, Musto, and Detective Getty. During their testimony, Contreras and Swiggett related that in June 2011, Defendant had called each of them to discuss E.S. Contreras testified as follows concerning his conversation with Defendant:

> Q. Okay. What did [Defendant] start telling you?
>
> A. About the fact that he was being charged with some sex molestation.
>
> Q. Okay. What else did he tell you?
>
> A. He told me that [E.S.] was practically coming on to him, and it was sort of like a consensual thing, yeah, that's what it was. I mean, you know, it was something that he was being accused for which is a lie, that's what he said.

Swiggett also testified to a similar conversation with Defendant:

> Q. You start talking to him about how, I'm not saying the word "rape", but there had been touching. Is that pretty much how the conversation was going?
>
> A. He kept repeating that to me. And I -- I don't remember everything in the conversation. It was a very emotional conversation. He said that she came on to him; that, you know, she had touched his privates; he had touched her, nothing more, just repeatedly that he had not forced himself on her.
>
> Q. So that she came on to him, he said that to you?

- 4 -

A. Yes.

Q. Did he also say -- is this correct -- that she had touched his privates?

A. Yes.

Q. That you mentioned him saying, also, that he had touched her, is that correct?

A. Yes.

. . . .

Q. As far as your statement [to Detective Getty], the members of the jury have had a chance to read that and you've got this up here with you, as well. Do you remember [Defendant] telling you as you wrote in here, that he said that [E.S.] touched him in his privates, that he touched her, they were kissing and it got out of control? It's towards the end of that second big paragraph. Do you remember him actually saying the portion about it getting out of control and kissing, in addition to what you just testified to?

A. I don't remember, exactly. I'm sure this is exactly what was said, I wrote it at the time. I mostly remember that he just kept repeating that, you know, he didn't rape her, and I wanted to know, what did you do, and the whole situation was out of control, she came on to me. He was upset, I was upset.

Musto also testified on behalf of the State. She stated that around September 2010, she was made aware of allegations that Defendant had engaged in sexual acts with E.S. Musto testified that "I remember specifically having an argument with [Defendant] in our bedroom, and him turning around and yelling at me and telling

me that he had kissed [E.S.] and that she had came [sic] on to him and that that was

all that had happened, that I was making a big deal out of nothing, and that's -- that

my sister was a liar and that we were -- I was making a big deal out of nothing."

Musto further testified that shortly thereafter, E.S. disclosed Defendant's

abuse to her:

> Q. Okay. And what would you say about [E.S's] ability to disclose to you, at that point in time?
>
> A. She still wasn't able to disclose to me information, details. I still don't know details. She did tell me that he had forced her to perform oral sex. He had told -- she told me that it had happened a couple times during the time, that summer in 2008 that she was here. She told me that he had threatened her that if I ever found out that I wasn't going to -- I was going to blame her and I wasn't going to love her.

Musto also testified that while cleaning out Defendant's bedroom closet in 2011

following her separation from him, she found multiple photographs of E.S. taken

around 2008 — when E.S. was still 15 years old — stored together with "a lot of"

pornographic DVDs.

Defendant testified on his own behalf at trial and denied that he had ever

engaged in any inappropriate sexual conduct with E.S. He stated that there were

two incidents that occurred during which E.S. made inappropriate sexual advances

toward him, which he described as follows:

> A. And then the last room that I left -- the last room that I vacuumed was the guest room. That's where [E.S.] was

sitting in [sic] the computer. I asked [E.S.] to move out of the way so I can vacuum the area that she was sitting on, and then she went back and -- she went back to the computer, and I just finished the whole entire room. At this point, I'm done, I'm done vacuuming. I unplugged the vacuum cleaner from the socket, and I'm rolling the cord up . . . [E.S.] gets up, comes towards me while I'm rolling -- I'm wrapping up the cord . . . So she comes up to me, and she says, "Eddie." She hugs me. I did not expect this. She hugged me, and the first thing she said was, "Thank you for helping my sister. I'm very happy that my sister -- that you are helping my sister."

At this point, I say, "You're welcome." I pat her on the back. As we are separating, she tries to kiss me, and I pushed [E.S.] away. I have one hand on the vacuum cleaner, and I pushed [E.S.] away and, when I did that, one, I was in shock; and, two, I said, "What are you doing?" She said, "Oh, I'm sorry. I was just kidding around." I go, "I am a grown man, and you're disrespecting me in my own house. That is not a way for a young lady to act towards anybody."

Q. Where was this kiss directed?

A. Towards my mouth, and it never happened, because I pushed her away before it even touched me.

Q. What happened, if anything, after that?

A. After that, I -- she said -- she apologized for -- for her behavior. I wrapped up the cord, I put the vacuum cleaner into the closet, I left my house and I went to my job, to my office. I have keys to my office, and I just went to my job and kept -- and did some work that I needed to get done.

. . . .

Q. When this incident occurred and you left your house, was there some future time something else happened? Was

there another occasion when [E.S.] and you -- some incident happened?

A. Yes. The first incident, I thought that was the end of it, I thought that was it. I thought I was very clear to [E.S.], it's not -- something that you do not do, or try to do with a grownup. The second incident probably happened a week and a half later. I'm coming out of the master bathroom --

Q. The bathroom?

A. The bathroom, the master bathroom, I'm coming out of [sic] master bathroom. I just used the bathroom, I'm fully clothed. [E.S.] comes into the master bathroom, through the door, through the main door, and I'm coming out of the bathroom. [E.S.] runs and strad -- she jumps on me and straddles me, and puts her hands behinds [sic] the back of my neck. At this time, I take [E.S.'s] hands and take them off my neck and push [E.S.] down to the ground.

Q. You mean on the floor?

A. On the floor, on the floor and the carpet. And I thought things were -- I was in shock. I mean, I told [E.S], "If you keep on doing -- being -- doing your misbehavior, basically the way that you're being towards me, I am going to tell your mother and I'm going to tell your sister." And I did warn her, [i]f this happens again, all bets are off. I will tell your mom. And her mother was coming down a couple of days later. So I did threaten her that I would tell her mother of her misbehavior towards me.

At this point, [E.S.] turns and tells me, "Please do not tell anything to my sister or my mom, because you know how they are." She said -- she told me, "I promise not to do anything towards you, if you do not say anything to my mom or my sister." At this point, I took -- I went ahead and I told her, "Fine, I will not say anything, but if anything else happens after this, I'm telling everything that you have done." She said, "Okay," and that's how we

left it.  That was the only two incidents that happened in
my house, and I was -- one, I did tell [E.S.], "You're
disrespecting me in my home.  You took advantage of my -
- of my trust towards you."

The jury found Defendant guilty of one count of taking indecent liberties with

a child and acquitted him of the remaining charges.  Defendant was sentenced to 16-

20 months imprisonment and ordered to register as a sex offender for a period of 30

years.  Defendant gave oral notice of appeal in open court.

## Analysis

## I. Admission of DVDs

Defendant's first argument on appeal is that the trial court erred in admitting

evidence relating to three pornographic DVDs found by Musto in his bedroom closet

in 2011.  Defendant contends that the evidence regarding the DVDs lacked any

probative value, or, alternatively, that this evidence was more prejudicial than

probative.

A person is guilty of taking indecent liberties with children
if, being 16 years of age or more and at least five years older
than the child in question, he either:

(1) Willfully takes or attempts to take any immoral,
improper, or indecent liberties with any child of
either sex under the age of 16 years for the purpose
of arousing or gratifying sexual desire; or

(2) Willfully commits or attempts to commit any
lewd or lascivious act upon or with the body or any
part or member of the body of any child of either sex
under the age of 16 years.

N.C. Gen. Stat. § 14-202.1(a) (2013).

"'Indecent liberties' are defined as such liberties as the common sense of society would regard as indecent and improper. It is not necessary that defendant touch his victim to commit an immoral, improper, or indecent liberty within the meaning of the statute. Thus, it has been held that the photographing of a naked child in a sexually suggestive pose is an activity contemplated by the statute. Furthermore, a variety of acts may be considered indecent and may be performed to provide sexual gratification to the actor." *State v. Martin*, 195 N.C. App. 43, 51, 671 S.E.2d 53, 59 (2009) (internal citations, quotation marks, and brackets omitted).

The elements of taking indecent liberties with a child are:

> (1) the defendant was at least 16 years of age; (2) he was five years older than his victim; (3) he willfully took or attempted to take an indecent liberty with the victim; (4) the victim was under 16 years of age at the time the alleged act or attempted act occurred; and (5) the action by the defendant was for the purpose of arousing or gratifying sexual desire.[2]

*Id.* at 50, 671 S.E.2d at 59 (citation omitted).

In the present case, Musto testified as follows regarding her discovery of the DVDs:

> Q. Now, when you were clearing out [Defendant's] items in his room, did you, at the time of separation, in 2011, that summer, did you find anything else in that room?

---

[2] It is undisputed that during the time period at issue (1) Defendant was over 16 years old and more than five years older than E.S.; and (2) E.S. was under the age of 16.

A. Yes.

Q. Okay. What else did you find?

A. I found pornography.

Q. Okay. And did you find anything striking about the type of pornography that you found?

A. There was a lot of it, and -- but it's -- it didn't -- the ones that stood out in my mind were the ones that were teen or young affiliated by the name, the names of them. Like, one sticks out, it said it was high school something or other. The other one was teenage -- had a name of teenage as a title of it, teenage something.

The three DVDs at issue — which were introduced as State's Exhibits 10-A, 10-B, and 10-C — were discovered by Musto in Defendant's bedroom closet along with pictures of E.S. taken around 2008 when she was 15 years old. The contents of the DVDs were not shown to the jury; instead, only the DVD covers were admitted, and Musto was allowed to read their titles to the jury. The trial court instructed the jury immediately after the admission of this evidence that "the Court cautions you that these are only covers, they're not being viewed, so we actually don't know what's on them."

The first DVD, State's Exhibit 10-A, is titled "Headmaster" and the cover contains a picture of two females, one of whom is wearing an outfit suggestive of a parochial school girl's uniform and is seated on the floor in front of a man who is standing over her with his arms outstretched with her mouth in close proximity to

- 11 -

his genitals. The second DVD, State's Exhibit 10-B, is titled "Fast Times at Deep Crack High," and the cover displays two mostly nude females wearing only cheerleading skirts standing in front of a bank of school lockers. The third DVD, State's Exhibit 10-C, is titled "Teenage Peach Fuzz," and its cover shows a scantily clad female in a sexually suggestive pose. While the precise ages of the females depicted on the covers of the DVDs cannot be discerned, they can be generally described as young women.

North Carolina Rule of Evidence 404(b) states, in pertinent part, that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.R. Evid. 404(b). Under North Carolina Rule of Evidence 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.R. Evid. 403.

> [W]hen analyzing rulings applying Rules 404(b) and 403, we conduct distinct inquiries with different standards of review. . . . We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b). We then review the trial court's Rule 403 determination for abuse of discretion.

*State v. Beckelheimer*, 366 N.C. 127, 130, 726 S.E.2d 156, 159 (2012).

In applying Rule 404(b), this Court has held that

> [c]ases decided under N.C.R. Evid. 404(b) state a general rule of inclusion of relevant evidence of other crimes, wrongs, or acts by a defendant, subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged.
>
> Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*State v. Houseright*, 220 N.C. App. 495, 497-98, 725 S.E.2d 445, 447 (2012) (internal citations and quotation marks omitted). However, while we construe Rule 404(b) as a general rule of inclusion, it is nevertheless "constrained by the requirements of similarity and temporal proximity." *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002).

Defendant argues that pornography not bearing any relation to the offense for which he was charged is inadmissible under Rule 404(b). Defendant is correct that

> [a]s a general rule, evidence of a defendant's prior conduct, such as the possession of pornographic videos and magazines, is not admissible to prove the character of the defendant in order to show that the defendant acted in conformity therewith on a particular occasion. However, such evidence of prior conduct is admissible so long as it is relevant to some purpose other than to show the character of the defendant and the defendant's propensity for the type of conduct for which he is being tried. Examples of such proper purposes include proof of motive, opportunity,

intent, preparation, plan, knowledge, identity, or absence
of mistake, entrapment, or accident.

*State v. Smith*, 152 N.C. App. 514, 521, 568 S.E.2d 289, 294 (internal citations and quotation marks omitted), *appeal dismissed and disc. review denied*, 356 N.C. 623, 575 S.E.2d 757 (2002). The State contends that the DVD evidence was properly admitted under Rule 404(b) due to the fact that the DVDs were "of an uncommon and specific type of pornography[,]" characterizing the three DVDs as "depict[ing] the sexualization of teenage girls" and asserting that "E.S. was the clear object of the sexual desire implied by the possession."

In *State v. Brown*, 211 N.C. App. 427, 710 S.E.2d 265 (2011), *aff'd per curium*, 365 N.C. 465, 722 S.E.2d 508-09 (2012), the defendant was charged with taking indecent liberties with a child and first-degree rape of his ten-year-old daughter. *Id.* at 427-28, 710 S.E.2d at 266-67. During a subsequent investigation of the defendant's home by a Department of Social Services social worker and a detective, a copy of an erotic publication called "Family Letters" was discovered. The publication contained anonymous letters purporting to describe the correspondents' sexual experiences with other family members. Graphic illustrations accompanied the letters. *Id.* at 428-29, 710 S.E.2d at 267. The defendant moved to exclude this evidence, but the trial court denied his motion and admitted the publication as evidence of the defendant's intent or motive to commit the offenses with which he was charged. *Id.* at 429, 710 S.E.2d at 267.

On appeal, the defendant argued that the trial court erred in admitting the Family Letters because it was purely inadmissible character evidence. *Id.* at 430, 710 S.E.2d at 268. In rejecting the defendant's argument, we stated the following:

> In arguing that Family Letters was inadmissible because it was not shown to [the defendant's daughter] or was not "used in the commission of the offense," [the defendant] relies on previous decisions by this Court holding that evidence of possession of pornography, or evidence of deviant sexual conduct, was inadmissible because the evidence in each case did not serve an appropriate Rule 404(b) purpose. However, these holdings, in light of the inclusive nature of Rule 404(b), cannot be read to create any broadly-applicable rule with respect to the admissibility of pornography in a criminal case. The determination in each case was not whether possession of pornography is ever relevant to serve a purpose other than proving a defendant's propensity to act in a certain way. Rather, the determination in each case was whether possession of pornography *in that case* provided relevant, non-propensity proof under the circumstances of the case. . . .
>
> The circumstances of this case, however, are easily distinguishable from [other Rule 404(b) pornography] cases: the possession was of an uncommon and specific type of pornography; the objects of sexual desire aroused by the pornography in evidence were few; and the victim was the clear object of the sexual desire implied by the possession. Accordingly, the relevance of the evidence of [the defendant's] possession of Family Letters is not governed by this Court's prior decisions holding as inadmissible evidence of a defendant's possession of general pornography, and we conclude that the trial court correctly admitted evidence of [his] possession of Family Letters as relevant evidence showing both [his] motive and intent in committing the acts underlying the charged offenses, two proper purposes for such evidence under Rule 404(b).

*Id.* at 431-32, 710 S.E.2d at 268-69 (internal citations omitted).

In the present case, the DVD covers — collectively — convey themes related to the sexualization of high school age girls and the submission of young women to older men. Absent the presence of the photographs of E.S. found in close proximity to the DVDs in Defendant's bedroom closet, the admissibility of this evidence under Rule 404(b) would present a closer question. However, given that pictures of E.S. taken when she was approximately 15 years old were found in Defendant's bedroom closet along with pornographic DVDs depicting the sexualization of high school age girls, we believe this evidence was sufficiently probative of motive and intent to warrant admission under Rule 404(b).[3]

Moreover, based on the evidence in this case, we cannot say that the trial court abused its discretion in conducting the Rule 403 balancing test. *See Brown*, 211 N.C. App. at 438, 710 S.E.2d at 273 ("[A]side from [the defendant's] own unsupported contention, there is nothing to show that the jury convicted [him] solely out of 'disgust' for the content of [his] pornography. As such, we must conclude that the jury's

---

[3] Defendant also asserts that the discovery of the DVDs in 2011 was too remote in time from the dates of the acts forming the basis for his charges to allow their admission under Rule 404(b). However, we have held that remoteness in time generally affects only the weight afforded to such evidence rather than its admissibility. *See State v. Mangum*, __ N.C. App. __, __, 773 S.E.2d 555, 563 (2015) ("Remoteness in time generally affects only the weight to be given Rule 404(b) evidence, not its admissibility." (citation, quotation marks, and brackets omitted)). Moreover, the force of Defendant's argument on this issue is diminished by the fact that any gap in time between the acts of abuse and the discovery of the pornographic DVDs is eclipsed by the fact that these DVDs were found in close proximity to pictures of E.S. taken at or around the time period in which the sexual abuse occurred.

*potential* disapproval of [the defendant's] possession of the pornography did not substantially outweigh the strong probative value of the evidence in showing [his] motive, intent, and purpose with respect to the alleged conduct."). Therefore, Defendant's argument on this issue is overruled.

## II. Morris' Testimony

Defendant's final argument on appeal is that the trial court plainly erred by allowing Morris to offer expert testimony regarding E.S.'s allegations of sexual abuse. Prior to trial, Defendant filed a motion *in limine* seeking to prohibit the State from eliciting expert testimony from Morris on the ground that she had not previously been identified as an expert witness by the State.

The scope of Morris' anticipated testimony was discussed during a pre-trial hearing:

> [DEFENSE COUNSEL]: Judge, one thing that I am specifically concerned about, as a result of conversations with the district attorney, was that there would be a great chance that they might want to propound to this witness for an expert opinion as to why or if, based on her experience and training, females do not disclose sexual attacks right away after they happen. The period of time in this case is two years. So I am concerned that that's what they're going to do, and I don't think that's admissible, and I think it's -- should be addressed before it arises.
>
> [PROSECUTOR]: Judge, I mean, I agree that we -- like -- once again, I can't ask any questions about the nature of disclosure in child sex cases or with females. I think there's a fine line between saying, you know, how do these things

work and getting into expert testimony and saying --
asking other questions about [E.S.], specifically, in her
experience with [E.S.] and what she's seen. That would go
to -- any lay person could testify to that, and so I agree with
[Defense Counsel] that -- and I don't intend to offer
anything as -- of her -- proffering her as an expert in the
field of child forensic psychology, or anything of the sort,
but I do think that there's a distinction where, if an expert
is a lay witness, as well, it can kind of -- the Court would
have to, obviously, make a ruling on that, if it were to come
up.

THE COURT: Well . . . the times that I've tried these type
cases, the witness was able to give an opinion as to why a
person has made a delayed disclosure, so they will be able
to pursue that.

Morris then proceeded at trial to testify as a witness for the State. During her

testimony, the following exchange took place:

[Morris]: I've had several cases of sexual abuse revealed to
me and, in most of those cases, information with those
particular victims have been coming forth, like,
sporadically. They -- depending on the person, the trauma
to the person or their mental state, being able to divulge
parts of it at a time depends on how the person can handle
--

[DEFENSE COUNSEL]: Judge, we will object.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Based on our motion.

Later in Morris' direct examination, she testified as follows without objection

by Defendant's trial counsel.

Q. And at the -- at what point, did [E.S.] disclose anything

to you from that summer?

A. I believe it was a trigger that prompted her to disclose. Her sister and [Defendant] were coming to New York on that particular date, and that -- I believe it brought -- it put her under tremendous anxiety and, at that point, she revealed the information to me.

. . . .

Q. And did you notice anything about [E.S.], after she had disclosed to you?

A. From that point forward, we continued to meet, and there was a lot of anxiety, a lot of very, like, nervous behavior over the next few months, because I worked with her until the end of the school year, and she was -- she was under a lot of stress, a lot of anxiety, you know. We call it, like, reliving the trauma again. So I think it brought back a lot of memories.

. . . .

Q. At the same time, were you working with [E.S] emotionally?

A. Oh, absolutely. In situations like this when, you're working with a client, again, like I said, there's a lot of anxiety, there's a lot of shame, there's a lot of -- of guilt. There's a lot of -- there's a lot of -- sometimes depression that comes up, because the person is having all these mixed feelings about what they could have done to possibly, like, avoid the situation, their part in the situation. So there was a lot of, like, having to reassure her that, you know, she -- she was 15 years old, and it was not her place -- her responsibility to keep things under control.

Q. So with that, is that -- those things, those things you're trained to look for, is that what you saw in [E.S.]?

A. Absolutely.

. . . .

Q. In your discussions with [E.S.], was she hesitant to report this?

A. Of course, she was scared. Most kids who come forth with this kind of information are scared to report it because, again, they do not know what the outcome is going to be across the board, within the family, within the legal system, what's going to happen, what's going to happen to them, you know. Just even having to share or report to other people what happened, having to tell the story again, which can be traumatizing, we call it re-traumatizing the victim, because they have to relive the incident again and again every time they have to tell the story, so that brings a huge amount of anxiety on to the person reporting.

. . . .

Q. Was -- what was the nature of her reporting these incidents? Did she report when her -- when the defendant and his wife were coming up to New York, did she report it all at once, or was it piecemeal?

A. I believe, especially when these situation [sic] happen, the victim only can tell you what they can handle emotionally. So a lot of times in sexual abuse cases, information comes out piece by piece, because it's what the person can handle emotionally and mentally at the time. So some parts may come out in the beginning; and then, over time, the person will begin to share, you know, disclose a little bit more information, over time. So it depends on how much that person can handle, mentally and emotionally, what they disclose.

Defendant contends that the above-quoted testimony was improper because it amounted to opinion testimony that a lay witness was not permitted to offer and that

the trial court committed plain error by not intervening *ex mero motu*, particularly in light of its ruling on Defendant's motion *in limine*. *See* N.C.R. Evid. 701 ("If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.").

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice — that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*State v. Lawrence,* 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations, quotation marks, and brackets omitted).

Even assuming, without deciding, that Morris' testimony did exceed the permissible scope of lay witness testimony, we conclude that the admission of this evidence did not rise to the level of plain error. In addition to E.S.'s testimony, the evidence against Defendant included Swiggett's, Contreras' and Musto's testimony regarding Defendant's admissions to each of them that he had inappropriate contact with E.S. Furthermore, the State presented corroborative evidence from Sergeant

Perrigo and Detective Getty regarding E.S.'s account of Defendant's sexual abuse of her.

The offense of taking indecent liberties requires only an action on the part of Defendant that "the common sense of society would regard as indecent and improper." *Martin*, 195 N.C. App. at 51, 671 S.E.2d at 59. Here, testimony from multiple witnesses established that Defendant engaged in at least some form of sexual contact with E.S. Moreover, while Defendant's various statements maintained that any sexual contact between them was consensual, a defendant's use of force is not an essential element of the crime of taking indecent liberties with a child. Indeed, in the context of other sexual crimes against children, we have expressly held that a victim's consent is no defense. *See State v. Sines*, 158 N.C. App. 79, 84, 579 S.E.2d 895, 899 ("[A]n individual may commit the crime of statutory sexual offense regardless of the defendant's mistake or lack of knowledge of the child's age. . . . [C]onsent is not a defense to the crime of statutory sexual offense." (internal citations omitted)), *cert. denied*, 357 N.C. 468, 587 S.E.2d 69 (2003).

Therefore, Defendant has failed to show that the admission of the challenged testimony by Morris amounted to plain error. *See Elkins*, 210 N.C. App. at 126, 707 S.E.2d at 755 ("The plenary evidence incriminating Defendant . . . was such that the [erroneous] admission of [the lay witness's] statement did not prejudice Defendant's trial. Therefore, even though the admission of the statement was error, we conclude

it was not plain error." (internal citation omitted)); *see also State v. Whitted,* 209 N.C. App. 522, 530, 705 S.E.2d 787, 793 (2011) ("Defendant contends that this lay opinion testimony constitutes plain error in that it likely 'tilted the scales' and resulted in her conviction. We are not persuaded. Assuming without deciding that the admission of [the lay witness's] testimony was error, we do not believe it was an exceptional, fundamental error which resulted in a miscarriage of justice or altered the jury's verdict."); *State v. Gobal,* 186 N.C. App. 308, 319, 651 S.E.2d 279, 286 (2007) ("Though [defendant's trial for indecent liberties with a child and first-degree statutory sexual offense] ultimately rested on whether the jury chose to believe the story of [the victim] or that of defendant, defendant's credibility was impeached in many different ways . . . Given the amount of testimony which directly or indirectly impeached defendant, the jury had ample evidence, besides the [erroneously admitted] testimony of [the lay witness], which might have caused it to disbelieve the story of defendant and believe the story of [the victim]. We find no plain error."), *aff'd per curiam,* 362 N.C. 342, 661 S.E.2d 732 (2008).

In a related argument, Defendant contends that he received ineffective assistance of counsel at trial. Specifically, Defendant asserts that he was "irrevocably prejudiced" because his trial counsel failed to object to the portions of Morris' testimony he now challenges on appeal.

In order to establish ineffective assistance of counsel, "a defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense." *State v. Phillips*, 365 N.C. 103, 118, 711 S.E.2d 122, 135 (2011) (citation and quotation marks omitted), *cert denied*, __ U.S. __, 182 L.Ed.2d 176 (2012).

> Deficient performance may be established by showing that counsel's representation fell below an objective standard of reasonableness. Generally, to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (internal citations and quotation marks omitted), *cert. denied*, 549 U.S. 867, 166 L.Ed.2d 116 (2006). Moreover, "if a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." *State v. Braswell*, 312 N.C. 553, 563, 324 S.E.2d 241, 249 (1985).

For the reasons discussed above, Defendant cannot show a reasonable probability of a different outcome absent the admission of these portions of Morris' testimony. Therefore, we reject Defendant's ineffective assistance of counsel claim. *See State v. Steele*, 201 N.C. App. 689, 698, 689 S.E.2d 155, 162 (2010) ("In light of

this substantial evidence [of guilt], defendant has not met his burden of showing that the outcome of his trial would have been different had his counsel challenged the admissibility of the lab report. Accordingly, defendant failed to establish any ineffective assistance of counsel.").

## Conclusion

For the reasons stated above, we conclude that Defendant received a fair trial free from prejudicial error.

NO PREJUDICIAL ERROR.

Judges BRYANT and INMAN concur.

Report per Rule 30(e).