ZACHARY, Judge.
 

 *549
 
 Ed Levan Harris (defendant) appeals from the judgment entered upon his convictions of attempted first-degree murder, assault with a deadly weapon intending to kill inflicting serious injury, and possession of a firearm by a convicted felon. On appeal, defendant argues that the trial court committed plain error by allowing the State to offer testimony related to gang activity in Kinston, North Carolina in July of 2014. In the alternative, defendant argues that he received ineffective assistance of counsel, based upon his trial counsel's failure to object to the challenged testimony. After careful consideration of defendant's arguments, we conclude that defendant is not entitled to relief based on either of these arguments.
 

 *550
 

 Factual and Procedural Background
 

 On 3 July 2014, Keith Williams sustained a gunshot wound to the back of his neck. On 2 February 2015, defendant was indicted for attempted first-degree murder, assault with a deadly weapon intending to kill inflicting serious injury, and possession of a firearm by a convicted felon, with all of these charges arising from the incident in which Mr. Williams was shot.
 

 The charges against defendant were tried beginning on 18 April 2016. The State's evidence tended to show, in relevant part, the following: Sergeant Roland Davis of the Kinston Police Department testified that shortly after midnight on 3 July 2014, he was dispatched to a convenience store on Martin Luther King Jr. Boulevard in response to a reported shooting incident. Mr. Williams was sitting in front of the store, and Sergeant Davis saw a bullet hole in the back of Mr. Williams's neck. Mr. Williams indicated that he had been shot at a location several blocks away, and Sergeant Davis found a .25 caliber shell near a small pool of blood on Fields Street.
 

 Keith Williams testified that between sixth and tenth grades he attended Sampson School. Defendant was a student at the same school, and Mr. Williams and defendant spent time together. During the time that defendant and Mr. Williams attended the same school, they had no fights or disagreements. After Mr. Williams transferred to a different
 
 *329
 
 school, they did not see each other often.
 

 Shortly after midnight on the night of 3 July 2014, Mr. Williams was walking in Kinston when defendant called to him and they greeted each other. Defendant was riding a bicycle which Mr. Williams described as a BMX "trick bike." As defendant and Mr. Williams walked along, defendant asked Mr. Williams if he wanted to smoke marijuana, and Mr. Williams agreed. When a law enforcement officer passed them, defendant suggested that they move to a side street, and they turned onto Fields Street. After they left the main street, defendant passed Mr. Williams the marijuana cigarette and then, with no warning, he shot Mr. Williams in the neck.
 

 After he was shot, Mr. Williams turned around and saw defendant riding away on his bike. Mr. Williams ran to Martin Luther King Jr. Boulevard and asked someone at a convenience store to call 911. Mr. Williams testified that when he spoke with law enforcement officers shortly after he was shot and while he was in the hospital, he did not reveal who had shot him because he feared for his personal safety. When Mr. Williams returned home from the hospital, he spoke with his
 
 *551
 
 family and decided to share information with law enforcement officers. Accordingly, Mr. Williams met with Kinston Police Officer Eubanks and provided a recorded interview during which Mr. Williams told Officer Eubanks that defendant was the person who had shot him.
 

 Mr. Williams believed that defendant was "associated with" members of the Bloods, a street gang, but did not know if defendant was a member of the gang. Several weeks prior to Mr. Williams's meeting with defendant, a "high ranking" member of the Bloods had been killed. Mr. Williams "associated" or socialized with members of the Crips, a rival street gang, but was not a member of the gang. Mr. Williams spoke with law enforcement officers several times before he admitted his association with the Crips. Mr. Williams had previous criminal convictions for various offenses, including felony larceny and assault on a female, and he was on probation at the time of trial. On cross-examination, Mr. Williams testified that he was shot a second time on 10 August 2014, while defendant was incarcerated, that Mr. Williams's cousin, Shakeel Stanley, was in the Crips gang, and that Mr. Stanley lived in an apartment on Morningside Drive.
 

 Officer Douglas Connor of the Kinston Police Department testified that on 15 July 2014, he participated in a search of Apartment C on Morningside Drive. Law enforcement officers seized an Astra Firecat handgun in a bedroom. Forensic testing showed that the Astra Firecat had fired the bullet whose shell casing was found on Fields Street. Kinston Police Officer Travis Moore testified that several weeks prior to the incident in which Mr. Williams was shot, the officer had arrested defendant for misdemeanor possession of marijuana and trespassing at the Morningside Drive address. At that time, defendant told Officer Moore that he was visiting someone who lived in Apartment C. On 16 July 2014, Officer Connor assisted with the search of a home on South Adkin Street, where defendant lived with his parents. In a bedroom, officers found a cell phone that had a photo of defendant on the lock screen, as well as .25 caliber bullets. Officers also seized a BMX bicycle, which was the brand of bicycle described by Mr. Williams. Officer Connor took the bicycle to the law enforcement center, and as he was taking the bike to the evidence storage area, defendant appeared in the company of other officers and said, "That's my bike, boy" in an agitated manner.
 

 Defendant offered the testimony of Sergeant Chad Rouse of the Kinston Police Department. On 15 July 2014, Sergeant Rouse was dispatched to the Morningside Drive apartments to investigate a report that Mr. Stanley had been shot. The apartment smelled of marijuana, and drug paraphernalia was observed inside. Thereafter, Sergeant
 
 *552
 
 Rouse obtained a search warrant, pursuant to which the Astra Firecat handgun was seized. Mr. Stanley was arrested for a narcotics charge. Kinston Police Sergeant Stephen Reavis testified that when Mr. Stanley was arrested he was in possession of pills that appeared to be narcotics.
 
 *330
 
 On 23 April 2016, the jury returned verdicts finding defendant guilty of attempted first-degree murder, assault with a deadly weapon intending to kill inflicting serious injury, and possession of a firearm by a convicted felon. The trial court consolidated the offenses for purposes of sentencing and imposed a sentence of 162 to 207 months' imprisonment. Defendant noted a timely appeal to this Court.
 

 Admission of Testimony Related to Street Gangs
 

 Prior to trial, defendant filed a motion
 
 in limine
 
 addressing the potential admission of evidence or testimony concerning street gangs. In his motion, defendant alleged that the Kinston Police Department had a unit that was commonly referred to as the Gang Unit; that defendant believed that the State might try to introduce evidence of defendant's membership in a gang; that the weapon associated with the shooting was seized from an apartment where a gang member lived, and; that Mr. Williams had made a statement in which he speculated that the shooting was gang-related. Defendant also made two contradictory assertions: first, that Mr. Williams's "mere suppositions do not show that gang membership is relevant in this case", but also that "the shooting of the victim may have been gang related" although defendant was not involved. In his prayer for relief, defendant asked that the trial court:
 

 1. Not allow any use of the word "gang" including in the context of the law enforcement "Gang Unit."
 

 2. In the alternative, if the Court does allow the use of the term "gang" to be used as an admission or fact against the defendant, that it be fair game as to the examination and cross-examination of all witnesses.
 

 Following a hearing on defendant's motion
 
 in limine
 
 , the trial court ruled that the State and law enforcement officers would not be allowed to refer to the "Gang Unit" in the Kinston Police Department, but that Mr. Williams would be allowed "to testify to the fact that he had-associated with gang members and hung around with certain gang members, and be able to testify from his personal knowledge as to the defendant's similar association with a particular gang." Defendant did not note an objection to the trial court's ruling, or object at trial to Mr. Williams's testimony that (1) he socialized or associated with members of the Crips
 
 *553
 
 gang; (2) defendant socialized with members of the Bloods gang; and (3) a few weeks before Mr. Williams was shot, a "high-ranking" member of the Bloods had been shot. In addition, defendant was permitted to cross-examine witnesses concerning gang-related issues. For example, defendant's counsel obtained admissions from Mr. Williams that he did not know whether defendant was a gang member, and that the firearm used to shoot him had been found in an apartment where his cousin, a member of the Crips, was living.
 

 On appeal, defendant concedes that he did not object to the introduction of this testimony at trial, and asks that we review it for plain error. However, as discussed above, defendant's motion
 
 in limine
 
 requested that the trial court
 
 either
 
 bar any reference to the word "gang",
 
 or
 
 in the alternative, if witnesses were permitted to testify about gangs, that the term "gang" would be "fair game as to the examination and cross-examination of all witnesses." The trial court allowed defendant's "alternative" request that he be allowed to cross-examine witnesses on gang-related matters.
 

 We have reviewed the transcript of this trial, and observe that on direct examination, Mr. Williams testified that he "associated with" members of the Crips, but was not a member of the gang, that defendant similarly associated with members of the Bloods, and that a high-ranking member of the Bloods had been shot a few weeks earlier. Defendant's counsel cross-examined Mr. Williams extensively about gang-related matters. Mr. Williams admitted that he did not initially admit to law enforcement officers that he associated with the Crips, that his cousin, Shakeel Stanley, was a Crip, that Mr. Williams had prior convictions for weapons offenses, that Mr. Williams typically drank and smoked marijuana with the Crips, that he possessed marijuana when he was shot, and that he was shot on a later occasion while defendant was in jail.
 

 *331
 
 In addition, in their closing arguments both the prosecutor and defense counsel urged the jury to consider gang-related issues. The prosecutor speculated that defendant may have shot Mr. Williams in an attempt to curry favor with the Bloods:
 

 PROSECUTOR: Keith [ (Mr. Williams) ] tells you that Ed [ (defendant) ] associates with Bloods. Well, I submit to you what's going on here-in the old mobster movies, sometimes you hear them talk about their "made" guys and-and there are guys who are lower level, hadn't gotten made yet. I submit to you we have a similar circumstance here. There's been, as Keith testified, a higher-ranking
 
 *554
 
 Blood that's been killed recently. Ed's a younger guy, just 17. He knows Keith associates with the Crips. The young guy wants to make a name for himself, move up the ladder.
 

 ...
 

 In the initial statement what you heard from Officer Eubanks, [Mr. Williams] put it this way: I think Ed was a Blood. He was looking for somebody to shoot.
 

 Defense counsel also referred to street gangs in his closing argument:
 

 DEFENSE COUNSEL: Keith says he associates with the Crips. I don't know what the semantics of "associate," "affiliate," but apparently it seemed to be an important distinction to him. And he says he believes that Ed associates with some other group, the Bloods. Now, why does Keith know a high-ranking member of the Bloods? You may ask yourself, why does he have that inside knowledge of high-ranking? I mean, what's going on here?
 

 ...
 

 Why would somebody who was associated with the Crips make up something about being shot? Why would somebody get shot again a few weeks later?
 

 ...
 

 So, the logical inference that you jurors are allowed to make, based on the evidence that you have seen and heard-throughout this case, I've been agog at the idea that that makes sense, that it makes sense that it's his. [ (that the Astra Firecat is defendant's.) ] Ask Keith who does Shakeel associate with? Crips. Everybody in this whole thing is associated, affiliated something-something-something. Blue bandannas, red stuff there. Keith's certainly not citizen of the year either. Why are guys out there getting shot up? It's not because they spend all of their time at the soup kitchen volunteering. It's not because they are at church all the time. Why does Keith get shot up twice? 'Cause he's out being a nice fellow? Is he honest? Keith a felon? Do you believe a guy with that kind of record?
 

 The record thus establishes that defense counsel and the prosecutor were each permitted to advance theories as to the relationship between
 
 *555
 
 gang-related issues in Kinston in 2014 and the identity of the person who shot Mr. Williams. The prosecutor argued that defendant may have shot Mr. Williams as a form of revenge for the recent shooting of a member of the Bloods, or in order to advance his status with that gang. Defense counsel pointed out that Mr. Williams was involved with the Crips, that the weapon with which he was shot was found in an apartment where a member of the Crips lived, and that Mr. Williams was shot by someone else several weeks later, after defendant had been incarcerated.
 

 On appeal, defendant does not dispute that in his motion
 
 in limine
 
 he posited that although defendant had not shot Mr. Williams, the shooting was, in fact, gang-related. It is undisputed that defendant was granted the alternative relief sought in his motion
 
 in limine
 
 , that he be permitted to cross-examine witnesses concerning gang-related matters. Moreover, it is clear from the contents of defendant's motion
 
 in limine
 
 , his cross-examination of Mr. Williams, and his closing argument, that defense counsel pursued a deliberate trial strategy of attempting to persuade the jury that there was a reasonable doubt as to defendant's guilt, based upon (1) Mr. Williams's affiliation with a street gang and his prior criminal record; (2) the fact that even after defendant was in jail Mr. Williams was shot by someone else; and (3) the fact that the weapon with which Mr. Williams was shot had been located in an apartment with which defendant had only a
 
 *332
 
 tangential association but where Mr. Williams's cousin, a Crip, was known to live. We conclude that the testimony that was elicited concerning street gangs was admitted in accordance with the relief sought by defendant-that if the trial court allowed testimony about street gangs, defendant should be allowed to cross-examine witnesses on gang-related issues.
 

 We further conclude that the error, if any, in allowing the admission of such testimony is a textbook example of invited error. Invited error has been defined as "a legal error that is not a cause for complaint because the error occurred through the fault of the party now complaining."
 
 Sain v. Adams Auto Grp., Inc
 
 .,
 
 244 N.C. App. 657
 
 , 669,
 
 781 S.E.2d 655
 
 , 663 (2016) (internal quotation omitted). This principle is codified in N.C. Gen. Stat. § 15A-1443(c) (2016), which provides that "[a] defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." In addition, defendant not only failed to object to the prosecutor's questioning of Mr. Williams about gang-related matters, but elicited testimony on this subject on cross-examination. Thus, even in the absence of his motion
 
 in limine
 
 , we would hold that he was not entitled to relief on the basis of the admission of this testimony:
 

 *556
 
 It is well established that the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character. Additionally, "[s]tatements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law," and a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review.
 

 State v. Steen
 
 ,
 
 226 N.C. App. 568
 
 , 575-76,
 
 739 S.E.2d 869
 
 , 875 (2013) (quoting
 
 State v. Gobal
 
 ,
 
 186 N.C. App. 308
 
 , 319,
 
 651 S.E.2d 279
 
 , 287 (2007) ) (other quotations omitted). We conclude that because defendant expressly requested that the trial court
 
 either
 
 exclude all evidence pertaining to gangs,
 
 or
 
 in the alternative, allow cross-examination on the subject, that any error in the admission of such evidence was invited. Consequently, defendant is not entitled to relief based on this argument.
 

 Ineffective Assistance of Counsel
 

 Defendant also argues that he received ineffective assistance of counsel, on the grounds that his trial counsel's failure to object to the introduction of testimony about street gangs was an error establishing that his counsel's performance was below the objective standard of reasonableness, and that there is a reasonable probability that, absent this error, defendant would not have been convicted. We conclude that defendant has failed to establish that he received ineffective assistance of counsel, and that he is not entitled to relief on this basis.
 

 We address a defendant's claim of ineffective assistance of counsel by applying the standards set out in
 
 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 ,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 (1984). To successfully assert an ineffective assistance of counsel claim, a defendant must satisfy a two-prong test:
 

 "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."
 

 State v. Braswell
 
 ,
 
 312 N.C. 553
 
 , 562,
 
 324 S.E.2d 241
 
 , 248 (1985) (emphasis omitted) (quoting
 
 Strickland
 
 ,
 
 466 U.S. at 687
 
 ,
 
 104 S.Ct. at 2064
 
 ,
 
 80 L.Ed.2d at
 
 693 ). "To
 
 *557
 
 demonstrate prejudice when raising an ineffective assistance of counsel claim, defendant must show that based on the totality of the evidence there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' "
 
 State v. Phillips
 
 ,
 
 365 N.C. 103
 
 , 144-45,
 
 711 S.E.2d 122
 
 , 151 (2011) (quoting
 
 Strickland
 
 ,
 
 466 U.S. at 694
 
 ,
 
 104 S.Ct. at 2068
 
 ,
 
 80 L.Ed.2d at
 
 698 ).
 

 "On appeal, this Court reviews whether a defendant was denied effective assistance of counsel
 
 de novo
 
 ."
 

 *333
 

 State v. Wilson
 
 ,
 
 236 N.C. App. 472
 
 , 475,
 
 762 S.E.2d 894
 
 , 896 (2014) (citation omitted). The determination of whether a claim of ineffective assistance of counsel may be addressed on direct appeal is analyzed as follows:
 

 "[Ineffective assistance of counsel] claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required, i.e., claims that may be developed and argued without such ancillary procedures as the appointment of investigators or an evidentiary hearing." Therefore, on direct appeal we must determine if these ineffective assistance of counsel claims have been prematurely brought. If so, we must "dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent [motion for appropriate relief] proceeding."
 

 State v. Al-Bayyinah
 
 ,
 
 359 N.C. 741
 
 , 752,
 
 616 S.E.2d 500
 
 , 509 (2005) (quoting
 
 State v. Fair
 
 ,
 
 354 N.C. 131
 
 , 166,
 
 557 S.E.2d 500
 
 , 524 (2001) ) (other citations omitted). In the present case, defendant's appellate counsel "respectfully maintains that the record is more than adequately developed for this Court to decide the case on this issue." We agree with defendant and will next proceed to evaluate defendant's claim of ineffective assistance of counsel.
 

 Defendant's claim that he received ineffective assistance of counsel is based solely upon his trial counsel's failure to object to the introduction of evidence related to street gangs. Defendant's appellate counsel contends that "there could be no strategic reason" for defense counsel's choice not to object, and that counsel "can think of no reason why" defendant's trial counsel would not have objected to the prosecutor's questioning of Mr. Williams on gang-related issues. However, the record clearly establishes that defendant's trial counsel "posit[ed] that the shooting of the victim Keith Williams may have been gang related," and that counsel was willing to accede to the prosecutor's introduction of evidence about gangs, provided that the defendant could cross-examine
 
 *558
 
 witnesses on the same subject. As discussed above, defendant's trial counsel pursued a trial strategy focused on Mr. Williams's own criminal record and gang connections, the fact that Mr. Williams was shot a second time when defendant was incarcerated, and the connection between the location where the gun was found and the gang with which Mr. Williams was associated. Defense counsel argued in closing that the State's prosecution of defendant reflected law enforcement officers' "tunnel vision" and the State's failure to explore other possible culprits. We conclude that defendant's trial counsel's decisions regarding the admission of evidence about street gangs were part of an intentional trial strategy. Thus:
 

 The defendant's complaint about counsel's [failure to object to testimony about street gangs] is in effect a request to this Court to second-guess his counsel's trial strategy. This we decline to do. ... Trial counsel are necessarily given wide latitude in these matters. Ineffective assistance of counsel claims are not intended to promote judicial second-guessing on questions of strategy as basic as the handling of a witness. We ordinarily do not consider it to be the function of an appellate court to second-guess counsel's tactical decisions[.]
 

 State v. Lowery
 
 ,
 
 318 N.C. 54
 
 , 68,
 
 347 S.E.2d 729
 
 , 739 (1986) (internal quotation omitted)). We conclude that defendant has failed to establish that his trial counsel's pursuit of a trial strategy that included consideration of the role of street gangs in Mr. Williams's shooting constituted ineffective assistance of counsel.
 

 Conclusion
 

 For the reasons discussed above, we conclude that defendant has failed to establish that the trial court erred by allowing the introduction of evidence pertaining to gangs, or that defendant's trial counsel's treatment of this issue constituted ineffective assistance of counsel. We further conclude that defendant had a fair trial, free of reversible error.
 

 NO ERROR.
 

 Judges CALABRIA and MURPHY concur.