IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-282

No. COA21-634

Filed 3 May 2022

Guilford County, Nos. 20 JA 502-03

In re: A.W. & C.W., minor juveniles.

Appeal by Respondent from order entered 18 June 2021 by Judge Marcus A. Shields in Guilford County District Court. Heard in the Court of Appeals 5 April 2022.

> *Mercedes O. Chut for Petitioner-Appellee Guilford County Department of Health and Human Services.*
>
> *Mary McCullers Reece for Respondent-Appellant Father.*
>
> *Parker Poe Adams & Bernstein LLP, by Eimile Stokes Whelan and Daniel E. Peterson, for guardian ad litem.*

GRIFFIN, Judge.

¶ 1      Respondent-Appellant Father appeals from the trial court's orders adjudicating each of his minor daughters, A.W. ("Ann") and C.W. ("Carol")[1], to be abused, neglected, and dependent juveniles and ceasing reunification efforts with

---

[1] We use pseudonyms to protect the anonymity of the juveniles and for ease of reading. N.C. R. App. P. 42(b).

Father. Father contends the trial court erred by allowing a child medical examiner to provide unsupported expert testimony that Carol was "in fact" sexually abused by Father, and that the trial court erred by denying his motion to exclude the child medical examiner's written report as inadmissible hearsay. We find no error, and affirm the trial court's order.

## I. Factual and Procedural Background

This case concerns repeated occurrences of alleged sexual abuse of two minor juveniles, Carol and Ann, by Father. At the time of the hearing in this case, Carol was seventeen years old and Ann was fifteen years old. Evidence presented at the adjudication hearing tended to show as follows:

In or around November 2019, Carol confided in her sister, Ann, that she had been sexually assaulted by Father. Carol had awoken at around 3:00 a.m. one night because Father was in her bed behind her. Father asked if he could lie with Carol, "started to rub [her] vagina with his fingers" for "maybe a minute", then "asked if he [could] put his penis inside." Father "proceeded to try and penetrate" Carol, but she "was tightening up her body so that [Father] couldn't actually penetrate [her]." After some time, Father stopped trying and left the room.

Ann told Carol that she had been similarly abused by Father on more than one occasion. Carol and Ann decided to tell Father's then-girlfriend, Ms. Smith. Ms. Smith helped the girls report their experiences to law enforcement. On 12 December

2019, an officer with the Greensboro Police Department went to Ms. Smith's home in response to a call regarding "sex offenses." The officer interviewed Carol and Ann and made a report of their statements. That same day, Guilford County Department of Health and Human Services received a report "alleging that [Father] had sexually abused [Carol] and [Ann]." Carol and Ann each reported prior accounts of sexual abuse by Father.

¶ 5      Carol first reported sexual abuse by Father in 2013, resulting in an investigation by law enforcement and Columbus County Department of Social Services. When she was nine years old, Carol told Father's girlfriend about how Father tried "to stick his penis in [her] vagina and how he would touch [her] vagina with his fingers." Father's girlfriend "call[ed] the police and that's when the investigation started." Carol underwent a child medical examination ("CME") as part of the investigation. Carol ultimately recanted these allegations due to pressure from some of her uncles and Father's girlfriend.

¶ 6      In 2016, Carol was diagnosed with a sexually transmitted disease at the age of twelve. Carol lived with Father at the time. Father "made [Carol] go on birth control" even though she was not voluntarily sexually active at that time. On at least one occasion, Father asked Carol to text him "vagina pics and [her] boobs." Carol did not send Father any pictures. Father also had Carol watch pornographic movies with him on their television at home.

¶ 7     Ann reported two prior incidents of abuse. The first time occurred at the children's grandparent's house before the girls went to bed. Ann gave Father a hug, and "felt his hand go down a little" and touch her lower back underneath her shirt. Father asked Ann if he could touch her and if she would "tell on [her] dad if he did anything bad." The second incident occurred in the home of one of Father's former girlfriends. Ann awoke one night because Father was "on [her] bed and he like had his hand on [her] boob." Ann "pushed [her] hand to the side a little and [she] acted like [she] was fixing to cry." Father then "walked out of the room like nothing ever happened."

¶ 8     On 2 January 2020, Dr. Esther Smith, a child medical examiner with the Cone Health Advocacy Medical Clinic, conducted CMEs on Carol and Ann. The CME consisted of forensic interviews and a physical examination. Ann did not allow Dr. Smith to physically examine her from the waist down.

¶ 9     During Carol's physical exam, Dr. Smith found "a small triangular piece" of skin that "sort of looked like a tissue tag" in Carol's genital area. The tissue "appeared to have . . . a divot behind it as if that tissue had detached from the tissue behind it." Dr. Smith had a "difficult call to decide" whether the tissue tag was Carol's "normal anatomy" or "evidence of a healed trauma." Dr. Smith reached out to the doctor who had performed Carol's CME in 2013 and was able to compare her findings with medical records collected from that CME. "[T]here did not appear to be a tissue

tag present in 2013 relative to what [Dr. Smith] was seeing in 2020."

¶ 10        Dr. Smith spoke with the police officer and social worker involved in the case. Dr. Smith also reviewed each girl's forensic interview and prior medical records. Dr. Smith produced written reports recording her CMEs of Carol and Ann (the "CME Reports"), incorporating her own findings as well as the materials she reviewed. The CME Reports were offered into evidence during the adjudicatory hearing. Father objected to admission of both CME Reports "based on hearsay and it being prejudicial to [Father]" arguing the reports were "riddled with hearsay from other people." The trial court overruled Father's objection, "based upon [the] business record exception as well as for purposes [of] medical diagnosis and note[d] that the probative value would outweigh any prejudicial effects."

¶ 11        Dr. Smith testified that Carol's statements were "consistent with what the physical evidence presented." Based upon the "totality of the information that [she] had", Dr. Smith testified that her expert opinion with respect to Carol was a "final diagnosis" that Carol had been a "victim of child sexual abuse." Father objected to Dr. Smith's opinion, arguing that her diagnosis was based upon insufficient physical evidence of abuse. The trial court overruled Father's objection.

¶ 12        Dr. Smith also testified that she had diagnosed Ann as a "suspected victim of child sexual abuse." Father objected to Dr. Smith's diagnosis of Ann because "there was no physical evidence of any sexual abuse during [Ann's] CME." The trial court

sustained Father's objection and did not consider Dr. Smith's opinion with respect to Ann.

¶ 13    Following the adjudicatory hearing, the trial court entered a written order adjudicating Carol and Anne to be abused, neglected, and dependent juveniles. The court held a dispositional hearing, then entered a written order ceasing reunification efforts with Father and suspending all visitation with Father. Father timely appeals.

## II.    Analysis

¶ 14    Father argues that Dr. Smith's expert opinion with respect to Carol was not supported by sufficient evidence, and that Dr. Smith's CME Reports contained inadmissible hearsay. We address each argument.

### A.  Expert Opinion on Sexual Abuse

¶ 15    Father contends "[t]he trial court erred by considering Dr. Smith's diagnosis of child sexual abuse where the diagnosis was based on Carol's disclosures rather than physical evidence." Because Dr. Smith "deemed [Carol's] disclosures to be the most important part of making her diagnosis", Father argues Dr. Smith's opinion lacked proper foundation to be admissible during Carol's abuse, neglect, and dependency adjudication.

¶ 16    We review a trial court's decision regarding the admissibility of expert testimony for an abuse of discretion, to assess whether the expert witness's qualifications and the expert testimony's relevance and reliability were shown by

sufficient evidence as required under Rule 702 of the North Carolina Rules of Evidence. *State v. McGrady*, 368 N.C. 880, 893, 787 S.E.2d 1, 11 (2016). Expert testimony should be admitted only where "the testimony is based on the special expertise of the expert, who because of his [or her] expertise is in a better position to have an opinion on the subject than is the trier of fact." *State v. Warden*, 376 N.C. 503, 506–07, 852 S.E.2d 184, 187–88 (2020) (citation and internal quotation marks omitted). "Whether sufficient evidence supports expert testimony pertaining to sexual abuse is a highly fact-specific inquiry." *State v. Chandler*, 364 N.C. 313, 318–19, 697 S.E.2d 327, 331 (2010) (citation omitted). "Different fact patterns may yield different results." *Id.*

¶ 17 In the context of criminal prosecution, our Courts have held that "[a]n expert's opinion that sexual abuse did in fact occur is admissible when there is physical evidence supporting a diagnosis of sexual abuse." *State v. Betts*, 377 N.C. 519, 2021-NCSC-68, ¶ 13 (citation omitted). Ordinarily, though, "the trial court should not admit expert opinion that sexual abuse has in fact occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility." *State v. Stancil*, 355 N.C. 266, 266–67, 559 S.E.2d 788, 789 (2002). (citations omitted). "[A]n expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." *Id.*

"Moreover, even when physical evidence of abuse existed and was the basis of an expert's opinion, where the expert added that she would have determined a child to be sexually abused on the basis of the child's story alone even had there been no physical evidence, we found *this additional testimony* inadmissible." *State v. Towe*, 366 N.C. 56, 61–62, 732 S.E.2d 564, 567 (2012) (emphasis added) (citation omitted). "Thus, an expert witness's 'definitive diagnosis of sexual abuse' is inadmissible unless it is based upon 'supporting physical evidence of the abuse.'" *Warden*, 376 N.C. at 507, 852 S.E.2d at 188 (citations omitted).

¶ 18        However, in the context of abuse, neglect, and dependency proceedings, this Court has distinguished the impact of improper expert testimony pertaining to child sexual abuse during a jury trial and the same or similar testimony in a bench trial:

> In a bench trial, the court is presumed to disregard incompetent evidence. Where there is competent evidence to support the court's findings, the admission of incompetent evidence is not prejudicial.
>
> . . .
>
> The mere admission by the trial court of incompetent evidence over proper objection does not require reversal on appeal. Rather, the appellant must also show that the incompetent evidence caused some prejudice. In the context of a bench trial, an appellant must show that the court relied on the incompetent evidence in making its findings.
>
> . . .

In a jury trial, the distinction between an expert witness' testifying (a) that sexual abuse in fact occurred or (b) that a victim has symptoms consistent with sexual abuse is critical. A jury could well be improperly swayed by the expert's endorsement of the victim's credibility. In a bench trial, however, we can presume, unless an appellant shows otherwise, that the trial court understood the distinction and did not improperly rely upon an expert witness' assessment of credibility. *Cf. Stancil*, 355 N.C. at 266, 559 S.E.2d at 789 (limiting its holding to "sexual offense prosecution[s]").

*In re Morales*, 159 N.C. App. 429, 433–34, 583 S.E.2d 692, 694–95 (2003) (some citations and internal marks omitted).

¶ 19    Father cites repeatedly to our Supreme Court's decision in *State v. Stancil* and this Court's decision in *State v. Grover,* 142 N.C. App. 411, 543 S.E.2d 179 (2001). *Stancil* and *Grover* each rely on the rule that an expert witness may not testify that sexual abuse occurred "in fact" absent some physical evidence supporting that diagnosis. *Stancil*, 355 N.C. at 266–67, 559 S.E.2d at 789; *State v. Grover*, 142 N.C. App. at 419, 543 S.E.2d at 183–84.

¶ 20    However, in addition to their criminal context, each case is otherwise distinguishable from the present case. In *Stancil*, our Supreme Court found error where the trial court allowed an expert to testify to her opinion that "the victim was *in fact* sexually assaulted" even though a "thorough examination and a series of tests revealed no physical evidence of sexual abuse." *Stancil*, 355 N.C. at 267, 559 S.E.2d at 789. In *Grover*, this Court held that the expert testimony of two experts each

"lacked a proper foundation and should not have been admitted" where they each testified that the child was a victim of sexual abuse, but their expert opinions were based solely on the child's disclosures and no physical evidence of sexual abuse. *Grover*, 142 N.C. App. at 418–19, 543 S.E.2d at 183 (citations omitted).

¶ 21      In the present case, Dr. Smith testified:

> [DR. SMITH:] In general the child's disclosures are going to be the most important aspect of making a diagnosis. And, understanding again the circumstances of those disclosures. . . . And, then if there is any physical evidence, trying to decipher whether that is consistent with what the child is saying.
>
> . . .
>
> I was trying to decide am I going to call [the tissue tag] abnormal or am I gonna call this inconclusive or am I gonna call it consistent with the disclosures that she's made. And, it's a gray area so it[']s not - like I said it[']s not diagnostic. But, it[']s certainly consistent with what she had said.
>
> . . .
>
> But, the fact that it was there now but didn't appear to have been there before seems like consistent with her disclosure that there was still new episodes of sexual abuse happening since after that first CME.
>
> . . .
>
> [DHHS:] Were the child's statements in this situation with [Carol] consistent with what the physical evidence presented?

[DR. SMITH:] Yes.

[DHHS:] So, what was your final diagnosis of [Carol]?

[DR. SMITH:] My final diagnosis in relation to the alleged maltreatment was that I had enough information to make a diagnosis of victim of child sexual abuse.

On cross-examination, Dr. Smith further testified:

[DR. SMITH:] [A]m I highly concerned and would a normal exam even without this skin tag have changed my diagnosis? It would not. Even if she had had a completely normal exam I would still likely have come to the same diagnosis based on the totality of the information that I had.

[DEFENSE:] So, you didn't rely on the physical - from what you just said. The physical evidence of sexual abuse does not make a difference in your –

[DR. SMITH:] I would still have - no. That's not accurate. I would still have relied on it. But I may have used the word suspected instead of just remove the word suspected all together and been more highly concerning.

Dr. Smith's testimony confirms that, contrary to *Stancil* and *Grover*, there was some physical evidence present in this case which caused Dr. Smith to suspect that Carol had been a victim of child sexual abuse. Dr. Smith was concerned by the presence of the tissue tag in Carol's genital area, and her concerns were strengthened by the fact that this tissue tag had not been present during Carol's earlier, 2013 CME. Dr. Smith testified that the physical evidence was consistent with Carol's disclosures of sexual abuse by Father, and that led her to conclude that Carol was a "victim of

child sexual abuse."

¶ 24        Father specifically directs our attention to Dr. Smith's testimony on cross-examination that "[e]ven if [Carol] had had a completely normal exam I would still likely have come to the same diagnosis based on the totality of the information that I had." Dr. Smith testified on cross-examination that a normal physical examination without the presence of the tissue tag would not have changed her diagnosis. This additional statement by Dr. Smith was inadmissible bolstering of Carol's credibility. *Towe*, 366 N.C. at 61–62, 732 S.E.2d at 567.

¶ 25        However, it was not prejudicial error for the trial court to allow this testimony. Father cannot now object to testimony that was first elicited by his own counsel's questioning. *State v. Gobal*, 186 N.C. App. 308, 319, 651 S.E.2d 279, 287 (2007) ("Statements elicited by a defendant on cross-examination are, even if error, invited error, by which a defendant cannot be prejudiced as a matter of law." (citations omitted)). Further, Dr. Smith subsequently reiterated that she nonetheless did rely on the physical evidence in reaching her diagnosis. Given Dr. Smith's clarification and her thorough testimony during direct examination, Father is unable to overcome the presumption that the trial court, acting as finder of fact, did not improperly consider Dr. Smith's additional bolstering. *Morales*, 159 N.C. App. at 433–34, 583 S.E.2d at 695 ("In a bench trial, however, we can presume, unless an appellant shows otherwise, that the trial court understood the distinction and did not improperly rely

upon an expert witness' assessment of credibility.").

¶ 26        Father contends the physical evidence in this case was insufficient to support admission of Dr. Smith's diagnosis because Dr. Smith was unable to confidently determine that the tissue tag was evidence of sexual abuse. To this end, Father compares the evidence in this case to the strength of the physical evidence at issue in in *State v. Ryan*, 223 N.C. App. 325, 734 S.E.2d 598 (2012). In *Ryan*, an expert witness testified to her opinion that the child's accounts were "consistent with sexual abuse" and her conclusion that the child had been "sexually assaulted," based upon the child's accounts and because she "observed a deep notch in the child's hymen, which she testified was highly suggestive of vaginal penetration." *Id.* at 329, 332–33, 734 S.E.2d at 601, 603. Here, Dr. Smith was unable to determinatively say whether Carol's tissue tag was or was not a direct result of sexual abuse, but did testify that the tissue tag was physical evidence which could indicate sexual abuse. We agree that the expert's testimony in *Ryan* was distinguishable in degree from the testimony given in this case, but we do not find this distinction material. The testimony in *Ryan* likely carried more weight than the evidence in this case, but the trial court's determination was one of admissibility, not of weight.

¶ 27        The trial court did not abuse its discretion and commit prejudicial error in allowing Dr. Smith's expert testimony diagnosing Carol as a "victim of child sexual abuse."

**B. Hearsay in Abuse Adjudication**

¶ 28        Father argues the "[t]rial court erred in admitting and considering the CME[ Report]s, including Carol and Ann's statements to the forensic interviewer, where it was not clear that the statements were for purposes of medical diagnosis." Specifically, Father contends that the CME Reports were inadmissible hearsay, and the trial court erroneously found that the CME Reports were admissible during the adjudicatory hearing as medical records obtained for the purpose of diagnosis under Rule 803(4) of the North Carolina Rules of Evidence.

¶ 29        "Where the juvenile is alleged to be abused, neglected, or dependent, the rules of evidence in civil cases shall apply." N.C. Gen. Stat. § 7B-804 (2021). "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C–1, Rule 801(c) (2021). Hearsay evidence is not admissible unless it falls into an exception described by another statute or rule of evidence. N.C. Gen. Stat. § 8C–1, Rule 802 (2021). Under Rule 803(4), a statement is excepted from hearsay if it was "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." N.C. Gen. Stat. § 8C–1, Rule 803(4) (2021). Likewise, under Rule 803(6), a business record may be excepted from hearsay where it was "made at

or near the time by, or from information transmitted by, a person with knowledge, if (i) kept in the course of a regularly conducted business activity and (ii) it was the regular practice of that business activity to make the" record. N.C. Gen. Stat. § 8C-1, 803(6) (2021).

¶ 30 Here, the trial court found that the CME Reports were admissible as statements for medical diagnosis under Rule 803(4) and business records under Rule 803(6). Father challenges only the trial court's determination under Rule 803(4). Therefore, even if we determine that the CME Reports do not satisfy our standards of admissibility under Rule 803(4), Father has failed to show that the CME Reports lacked admissibility as a record regularly made by Dr. Smith under Rule 803(6). *See* N.C. R. App. P. 28(a) ("The scope of review on appeal is limited to issues so presented in the several briefs. Issues not presented and discussed in a party's brief are deemed abandoned."). Because at least one unchallenged ground for admissibility remains, we hold the trial court did not err in admitting the CME Reports into evidence.

## III. Conclusion

¶ 31 The trial court did not err by allowing Smith to testify regarding her diagnosis of Carol because her opinion was supported by physical evidence. Further, Father has not shown that the trial court erred by admitting the CME Reports as exceptions to hearsay. The trial court's order is affirmed.

AFFIRMED.

IN RE: A.W. & C.W.

2022-NCCOA-282

*Opinion of the Court*


Judges MURPHY and GORE concur.